**Matter of John W. BENOIT, Jr.**

Supreme Judicial Court of Maine.
Argued Jan. 22, 1985.
Decided Feb. 6, 1985.

Merle W. Loper (orally), Portland, for Committee on Judicial Responsibility & Disability.

Doyle & Nelson, Jon R. Doyle (orally), Michael J. LaTorre, Augusta, for respondent.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, GLASSMAN and SCOLNIK, JJ.

PER CURIAM.

■ The Committee on Judicial Responsibility and Disability, by its report dated November 8, 1984, alleges that District Court Judge John W. Benoit, Jr., violated the Code of Judicial Conduct in seven cases, and that those violations warrant formal disciplinary action.[1] Specifically, Judge Benoit is alleged to have violated Canons 2 A and 3 A(1) of the Code by failing in his judicial decisionmaking to "respect and comply with the law" and to "be faithful to the law and maintain professional competence in it."[2] The judge through his counsel filed an answer denying the allegations. This judicial discipline case has been tried before the Supreme Judicial Court on questions of both fact and law. By our procedural order the Committee has the burden before the full court of proving, by a preponderance of the evidence, its allegations that Judge Benoit has violated the Code of Judicial Conduct.

■ the Supreme Judicial Court has a duty to prevent the slightest appearance of impropriety in the conduct of judicial business by a judge charged with official misconduct, pending final determination of the allegations against him. Accordingly, after considering the written arguments of counsel for both parties, we issued on November 21, 1984, an administrative order suspending Judge Benoit from the performance of his judicial duties until the Committee's allegations could be resolved on their merits. That administrative suspension was not a disciplinary measure; no sanction of any kind was, therefore, appropriate to be imposed upon that suspension.

Recognizing the undesirability of prolonging Judge Benoit's administrative sus-

---

1. The function of the Committee is investigative only, and its report is merely the formal means of commencing a judicial disciplinary proceeding before the Supreme Judicial Court. *Matter of Ross*, 428 A.2d 858, 860 (Me.1981). We here are sitting as the Supreme Judicial Court in exercise of its original jurisdiction in judicial discipline matters. In that capacity, we make both findings of fact and conclusions of law, without deference to any factual findings stated in the Committee's report.

2. Those canons of the Code of Judicial Conduct provide:

**CANON 2**

....

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

**CANON 3**

....

A. **Adjudicative Responsibilities.**

(1) A judge should be faithful to the law and maintain professional competence in it. . . .

pension beyond the time that is absolutely necessary, we have heard the matter on an expedited schedule. The evidence before us consists of the pleadings, a stipulation of certain facts entered into by the parties, and the transcript of testimony, with numerous exhibits, from the hearing before the Committee. After receiving comprehensive briefs from counsel for both the Committee and the judge, we sat to hear arguments on both facts and law on January 22, 1985.

■ In its report the Committee does not complain of *stiff,* but *lawful,* sentences. Rather, the central allegations of the report are that Judge Benoit *illegally* incarcerated a number of persons summoned into his court. As we explain in this opinion, the appropriate way to evaluate the alleged violations of the Code of Judicial Conduct is to apply an objective standard. The objective inquiry that we must make is whether a reasonably prudent and competent judge would in all the circumstances of a given case have concluded that Judge Benoit's actions were both obviously and seriously wrong. We find that in three instances of illegal incarceration in non-criminal matters, a reasonably prudent and competent judge would indeed have concluded that Judge Benoit's actions, were both obviously and seriously wrong. For his violations of the Code of Judicial Conduct we censure Judge Benoit, suspend him from the performance of his duties until March 1, 1985, and order him to forfeit $1,000 from his salary.

## I. *Standard for Reviewing Judicial Conduct under Canon 3 A(1)*

In this case we examine, for only the second time since the Committee was established, allegations that a Maine judge has engaged in conduct for which he should be sanctioned. It is always with regret that a court considers whether discipline should be imposed upon a judge. To have the conduct of one judge called into

question reflects on the entire judiciary. The process of reviewing allegations of misconduct, even if the allegations are ultimately determined to be unfounded, seriously interferes with the judge's effectiveness in conducting the business of the court. It is our clear duty, however, to ensure that no judge attempts to put himself above the law. Judicial power has its limits. A judge who transcends those limits strikes at the vitality of the very constitution under which he holds his judicial office.

■ We are here considering allegations of one particular type of misconduct: an alleged failure to live up to the standard of adjudicative responsibility established in Canon 3 A(1), as well as the more general Canon 2 A.[3] We first examine the standard for determining under Canon 3 A(1) whether a judge has failed to "be faithful to the law and maintain professional competence in it." Other canons in the Code of Judicial Conduct lay down an absolute standard. For instance, Canons 6 C and 7 A provide, respectively, that "[a] judge should report the date, place, and nature of any activity for which he received compensation ..." and that "[a] judge should not ... hold any office in a political organization...." Any failure to report outside compensation and the holding of any political office would automatically violate those canons. Those canons deal with subjects that do not admit of interpretation. Canon 3 A(1) in its language is similar in form but not in substance to its more absolutist counterparts. The demands of the law in some situations cannot be defined in clear and absolute terms; nor does the term "professional competence in the law" carry with it a well-defined meaning.

■ Every trial judge will from time to time commit legal errors in decisions later reversed on appeal, but judicial discipline would be in order in almost none of those cases. Something more than a mere error

**3.** Violations of Canon 3 A(1), if proven, also constitute violations of Canon 2 A. We limit our discussion to the more specific of the two canons.

of law is required to constitute misconduct under Canon 3 A(1).[4] In applying that canon to the facts of this disciplinary proceeding, we must examine just what is the "something more" that is necessary to elevate a mere error of law to sanctionable misconduct under Canon 3 A(1).

■ In Canon 3 A(1) cases in other jurisdictions, court opinions appear to have approached this question without any clear articulation of a standard of misconduct, merely stating in a conclusory way whether particular challenged action constituted judicial misconduct.[5] While it may always be possible for this or any court to determine on an "I know it when I see it" basis whether judicial conduct violates Canon 3 A(1), that approach is plainly unsatisfactory.

First, such an approach does not meet the need of citizens to know that their judges are being held to a defined and definable level of conduct. By such an approach a court will rarely be able effectively to convey to the public the underlying reasons why particular judicial action does or does not violate Canon 3 A(1). The public has a powerful interest in seeing that the judiciary stands willing to discipline its own members when necessary. A vague standard leaves room not only for doubt about why the conduct of an individual judge is being reviewed, but also for doubt about the effectiveness, to say nothing of the impartiality, of the reviewing process itself.

■ Second, when reviewing the conduct of a judge, a court must be as certain as possible of dispensing a consistent and rational brand of justice. The internal integrity of the disciplinary process is strengthened to the extent that it applies a definite standard.

Third, the case-by-case approach fails to indicate to judges the particular level of scrutiny that will be applied to their behavior, should it ever be challenged by the Committee on Judicial Responsibility and Disability. Of course, a judge will always be expected to try, as best he can, never to make an error of law. But should he make one, and should it be challenged as misconduct by the Committee, it is only fair that he know the standard by which he will be judged.

■ For those reasons, a case-by-case approach is not a satisfactory way to assess the propriety of judicial conduct under the mandates of Canon 3 A(1). Instead of a case-by-case approach, the Code requires a rule that can have general application to the wide variety of situations that a judge faces in court from day to day. The objective standard of what a reasonable judge would have done in the same circumstances meets the requirement of general applicability. The reasonable judge of our standard must be reasonable both in prudently exercising his judicial powers and in maintaining his professional competence. But the standard must be further restricted to recognize that every error of law, even one that such a reasonable judge might avoid making, is not necessarily deserving of disciplinary sanction. A judge ought not be sanctioned under Canon 3 A(1) for an error of law that a reasonable judge would not have considered obviously wrong in the circumstances or for an error of law that is de minimis. Putting all of these factors together, we conclude that, by an appropriate objective test, judicial conduct constitutes a violation of Canon 3 A(1) if a reasonably prudent and competent judge would consider that conduct obviously and seriously wrong in all the circumstances.

4. See Matter of Scott, 377 Mass. 364, 367, 386 N.E.2d 218, 220 (1979).

5. See, e.g., In re Lantz, 402 So.2d 1144 (Fla. 1981); State ex rel. Comm'n on Judicial Qualifications v. Rome, 229 Kan. 195, 623 P.2d 1307, cert. den., 454 U.S. 830, 102 S.Ct. 127, 70 L.Ed.2d 108, reh. den., 454 U.S. 1094, 102 S.Ct. 662, 70 L.Ed.2d 633 (1981); In re McDonough, 296 N.W.2d 648 (Minn.1979); Matter of Buford, 577 S.W.2d 809 (Mo.1979); In re Horan, 85 N.J. 535, 428 A.2d 911 (1981); Matter of Cieminski, 270 N.W.2d 321 (N.D.1978).

**1164** ■

Therefore, in summary, to determine in this case whether Judge Benoit's actions violated Canon 3 A(1), we ask in each instance whether a reasonably prudent and competent judge, putting himself in the place of Judge Benoit, would conclude that those actions were both obviously and seriously wrong.

## II. *Alleged Instances of Misconduct*

### A. *Violations of Canon 3 A(1)*

On the evidence before us, we conclude that Judge Benoit's actions in three factual situations, when evaluated by the objective test, constitute judicial misconduct and therefore involve sanctionable violations of Canon 3 A(1) of the Code of Judicial Conduct.

### 1. *State v. Tessin*

The Committee alleges that Judge Benoit committed judicial misconduct in his handling of the *Tessin* case in three respects: imposition of bail pending hearing in a civil case and imprisonment for failure to provide that bail; imposition of bail to assure payment of a civil fine; and imprisonment to satisfy a civil fine under circumstances denying the jailed individual his right to due process of law.

On the evidence before us, we find the following facts. The defendant, Mark R. Tessin, appeared before Judge Benoit in District Court (Skowhegan) on June 6, 1983, following his arrest on the charge of operating a motor vehicle while under the influence (OUI). Prior to Tessin's appearance before the judge, the State through an assistant district attorney elected to charge Tessin with only civil OUI, that is, a civil traffic infraction for which no jail sentence may be imposed.[6] At his appearance on June 6, Tessin requested that further proceedings on the civil complaint be postponed to give him time to consult with a lawyer. Judge Benoit agreed and put off Tessin's next appearance for two days, until June 8.

■ Judge Benoit had before him on June 6 various documents relating to the *Tessin* case, all of which plainly stated that Tessin was charged with only a civil traffic infraction, not with criminal OUI. The chief distinction between a civil and a criminal violation of the law is that, except in the case of civil commitment for contempt, when the contemnor "carries the key of his prison in his pocket,"[7] there can be no incarceration in a civil case. That distinction is basic to our system of justice.

■ Another basic concept is that bail exists *in a criminal case* for the purpose of allowing a defendant to remain out of jail until the next proceeding in his case, while at the same time providing assurance, in the form of money or a bond, that he will reappear in court for that proceeding. The reasons for bail are not applicable in the case of a civil traffic infraction, because there is no imprisonment from which to set the defendant temporarily free. Accordingly, there is no authority in the law to impose bail in a civil case.

Since Tessin was from Michigan, Judge Benoit feared that he would use the two-day period between June 6 and June 8 to leave the state, thereby escaping all consequences for his alleged drunken driving. Therefore, Judge Benoit imposed $300 bail, notwithstanding the foregoing undisputed and fundamental principles of law. Tessin was unable to make the bail, and so he was jailed on June 6 pending his answer to the civil complaint two days later.

On June 8 Tessin was brought from the Somerset County jail to the courthouse, where he admitted the civil traffic infraction. Judge Benoit ordered him to pay a $350 fine within one month and suspended his right to drive in Maine for 45 days. To prevent Tessin from leaving Maine without paying his civil fine, Judge Benoit again imposed $300 bail, which Tessin was again unable to meet. Judge Benoit again ordered him to jail for his failure to furnish

6. *See* 29 M.R.S.A. § 1312–C (Supp.1984–1985).

7. *In re Nevitt,* 117 F. 448, 461 (8th Cir.1902).

bail, but following some discussion Tessin agreed to the judge's suggestion that he instead serve off the fine in jail at $10 per day. Tessin was not represented by counsel, nor was he informed of any right to counsel. He proceeded to serve 35 days in the Somerset County jail.

Would a reasonably prudent, competent judge in all the circumstances have considered Judge Benoit's actions in this case to be obviously and seriously wrong? The answer must be that he undoubtedly would. Judge Benoit in this civil case sent Tessin off to jail for 35 days without respecting any of the safeguards required by our state and federal constitutions. The most basic right of citizens of this country is to be at liberty in society. That right is so essential to our way of life that it may only be taken away by the courts following carefully prescribed procedures. Judge Benoit deprived Tessin of his fundamental right of liberty in a civil case where the judge knew or plainly ought to have known he had no authority whatever to incarcerate.

Judge Benoit argues that his actions were justified by Tessin's agreement to the terms of his incarceration. What that argument ignores is that Tessin had no choice but to accept. Tessin knew that he was going to go to jail for failure to provide bail. In that situation, his only reasonable choice was to agree that his time in jail should be credited against the civil fine. When he fixed bail on June 8, the judge knew from two days earlier that Tessin would not be able to furnish bail. That clearly improper use of bail as a weapon of the State in a civil matter, rather than as a mechanism to secure a defendant's liberty, thus had the effect of directly imposing a 35-day jail sentence for a civil traffic infraction. This was an outrageous result.

■ There was, furthermore, no authority for allowing a defendant to serve off his civil fine in jail.[8] Any reasonably prudent and competent judge would think

that the jailing of Tessin in this civil case was obviously and seriously wrong because it flagrantly denied him his constitutional rights. Judge Benoit's actions in the *Tessin* .case violated Canon 3 A(1) of the Code of Judicial Conduct.

## 2. *State v. Wickham*

On the evidence before us, we find the following facts. The defendant, Mark S. Wickham, was charged with civil OUI. He admitted the civil traffic infraction in District Court (Skowhegan) on September 7, 1983. On that date Judge Benoit suspended his license for 45 days and imposed a $450 fine. The due date for payment of the fine was twice put off when Wickham appeared as required and requested additional time to make payment. Finally, on November 28, 1983, Wickham signed a document entitled "Release of all Claims" in which he agreed to do volunteer work in satisfaction of the fine. However, the form provided that:

I understand that in no way am I under any obligation to perform or donate my time, and that I am free to withdraw from this offer at any time, and that I will not be penalized in any way if I withdraw from this offer.

Wickham was assigned to do 121 hours of public service work for the sheriff's office. He completed 45½ hours of that work (originally reported as 21½ hours but later corrected) and then failed to do any more, even after the sheriff wrote to him to request that he return to work. On January 24, 1984, the District Court sent Wickham an order to appear on February 13 to prove that he had "made a good faith effort to pay" the fine. When Wickham appeared as required, Judge Benoit questioned him with regard to his reasons for stopping work. Because he found there was no good reason, Judge Benoit summarily adjudged Wickham in contempt of court, both for "non-appearance in regard to the

---

**8.** The Criminal Code provision authorizing imprisonment for unexcused nonpayment of a *criminal* fine, 17–A M.R.S.A. § 1304 (1983), has no application to a *civil* case.

unpaid fine" and for "non-appearance at the designated job site." He sentenced Wickham to 37½ days in jail in satisfaction of the fine (later reduced when credit was given for additional time worked at. the sheriff's office). After serving 11 days Wickham was released on a writ of habeas corpus issued by the Superior Court.

◼▬▬▬ The Committee alleges that these facts present another instance in which Judge Benoit failed to observe the most obvious limitations on his power to deprive an individual of his liberty. There is nothing in the law of Maine to authorize a judge to compel public service work as a way of satisfying a civil fine. We do not condone this unauthorized use of judicial power to get a civil defendant to agree to public service work. However, what is particularly serious is Judge Benoit's action in imprisoning Wickham when he declined to work further. The procedure followed was once again grossly deficient to accord Wickham his fundamental rights, and the imposition of a jail sentence to discharge his civil liability was patently unconstitutional. Wickham received no notice of a criminal hearing, nor was he charged with a criminal offense. Judge Benoit's order in fact left him in substantial doubt as to the reason he was being jailed. He was not provided with a lawyer because, Judge Benoit now argues, it was a civil proceeding. But the reason why no right to a lawyer attaches in a civil proceeding is that civil cases do not result in incarceration.[9] Judge Benoit also made no finding whether Wickham was honestly unable to pay the fine.[10] The clear implication from the record is that Wickham was at all times without funds.

The putative justification for the incarceration, that Wickham was being held in contempt, is simply not credible. Wickham had appeared in court every time he was ordered to do so. Furthermore, there was

no court order requiring him to report to the sheriff's office for work. It was patently unfair of Judge Benoit to treat the agreement as an order of court, for which Wickham could be held in contempt, when the agreement itself imposed no obligation on Wickham. It was obvious that Wickham was not guilty of either civil or criminal contempt. Wickham was jailed for his failure to discharge a civil liability of paying a civil fine, and not as punishment for violation of any court order.

In short, a reasonably prudent and competent judge would have found Wickham's incarceration in the circumstances both obviously and seriously wrong. Again, Judge Benoit's action in jailing a defendant in a civil case was so patently unconstitutional as to deserve sanction. His actions in the *Wickham* case violated Canon 3 A(1) of the Code of Judicial Conduct.

◼▬▬▬ We reemphasize that our disapproval of Judge Benoit's actions in jailing the defendants in both the *Tessin* and the *Wickham* cases does not arise out of any mere disagreement over sentencing philosophy. At the election of the prosecutor, both Tessin and Wickham had been charged *only* with the civil traffic infraction of operating under the influence. That infraction carried a maximum fine of $500 and license suspension of 45 days, *and no permissible imprisonment.* The prosecutor, and *not* the District Court judge, had *exclusive* and unreviewable discretion to prosecute an OUI case as a crime or a civil infraction.[11] Once the prosecutor had made his civil election, the only penalty beyond a license suspension that the court was empowered to order was a civil money judgment, collectible by the State only by civil process in the same manner as a money judgment obtained by a private plaintiff. However much a judge may disagree with the district attorney's decision to treat an

**9.** *See State v. Dowd,* 478 A.2d 671, 767 (Me. 1984).

**10.** *See Yoder v. County of Cumberland,* 278 A.2d 379 (Me.1971).

**11.** *See* 29 M.R.S.A. § 1312–C(7); *State v. Chubbuck,* 449 A.2d 347 (Me.1982).

OUI case as merely a civil traffic infraction, he has no right to use the criminal process of imprisonment to punish a civil defendant.

The Maine Legislature, with the concurrence of the Governor, created the system of prosecuting OUI as either a crime or a civil infraction, at the prosecutor's election.[12] That system represents the will of the elected representatives of the people, whose judgment it was that the public interest would thus be served. A judge is not free to disregard the application of any part of the OUI law, however much he or others may disagree with that legislative assessment of the public interest.

### 3. *State v. Heaton-Jones*

On the evidence before us, we find the following facts. On August 28, 1983, the Pittsfield police arrested two 13-year-old boys, Michael C. Day and John Heaton-Jones, on 14 identical charges. The juvenile intake worker released the boys to the custody of their parents. The boys were not formally charged until several months later, when they were scheduled to make their first appearance in District Court (Skowhegan) on November 30, 1983. The lawyer engaged for Michael Day entered an appearance by mail on behalf of his young client. Judge Benoit set January 9, 1984, for the adjudication hearing in Day's case, leaving him in the custody of his parents. John Heaton-Jones, however, had no lawyer and was accompanied only by his mother when he appeared before Judge Benoit at the scheduled time on November 30. The judge advised Heaton-Jones of his right to counsel and arranged for the appointment of a lawyer to represent the juvenile in *subsequent* proceedings. Judge Benoit took no evidence at the session with the boy and his mother. The judge set the

*Heaton-Jones* case for hearing on January 9, 1984, the same day that was set for the co-respondent's case; but he ordered Heaton-Jones taken immediately to the Maine Youth Center in South Portland for detention pending the adjudication hearing, then nearly six weeks away. Judge Benoit entered that detention order despite the fact that Heaton-Jones's juvenile intake worker had left him in his mother's custody since August and at no time requested the judge to order detention.[13] The Heaton-Jones boy regained his freedom only through a writ of habeas corpus issued by the Superior Court on December 6, 1983.

Judge Benoit's order detaining a juvenile for a period of nearly six weeks, before the boy had the assistance of counsel, and without the court's taking any evidence, ignored the most basic liberties and procedural requirements of law. The constitutional requirement of counsel at a hearing that results in the incarceration of a juvenile is beyond question.[14] Similarly, confining a juvenile without receiving any evidence whatever was inconsistent with minimal due process requirements.[15] By denying Heaton-Jones his fundamental rights, Judge Benoit committed an error that was obvious and of a most serious nature. Although Judge Benoit also failed to comply with section 3203 of the Juvenile Code, we need not consider that failure to reach our conclusion.

With only the complaint before him, Judge Benoit proceeded summarily to deprive Heaton-Jones of his basic right of liberty. Such action cannot be the product of a mere oversight or of a mere misreading of the law. We find as a fact that Judge Benoit knew or clearly ought to have known that the detention of Heaton-Jones was unlawful.

12. P.L.1981, ch. 468.

13. The Juvenile Code in 15 M.R.S.A. § 3203(4)(A) (Supp.1984–1985) provides: "An intake worker shall direct the release or detention of a juvenile pending his initial appearance before the court."

14. *See In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *State v. Stinson,* 424 A.2d 327, 331 (Me.1981).

15. *See S**** S**** v. State,* 299 A.2d 560 (Me. 1973).

Moreover, Judge Benoit's actions in this case are disturbing because they demonstrate an arbitrary and unfair course of conduct. The Judge accorded radically different treatment to the two identically situated juveniles. Michael Day had an attorney to represent him, and because that attorney entered an appearance for Day in a letter to the court clerk, Judge Benoit took no action on Day's case until January 9. In contrast, Heaton-Jones, who was charged with jointly participating with Day in the same unlawful activities, appeared personally on the date he was summoned. Judge Benoit ordered him into custody, at an institution about one hundred miles away from his home, for nearly six weeks pending the January hearing.

We find that a reasonably prudent and competent judge would consider that Judge Benoit's actions in this case were obviously and seriously wrong. He thus committed a sanctionable violation of Canon 3 A(1) of the Code of Judicial Conduct.

### B. Nonviolations of the Code of Judicial Conduct

We have carefully examined the remaining alleged instances of misconduct charged by the Committee and have found no error in them amounting to a sanctionable violation of the Code of Judicial Conduct.

#### 1. Adams v. Wells

The Committee challenges Judge Benoit's action in jailing Scott and Bonny Wells on March 3, 1983.[16] At a disclosure proceeding on July 15, 1982, in District Court (Farmington), the Wellses and their judgment creditor, Sherman Adams, entered into an installment payment agreement providing for weekly payments to Adams. Judge Benoit approved the settlement agreement, entitled "Consent to Installment Payment Order," and filed it with the court records.

When the Wellses stopped making the required payments after about five weeks, Adams filed a motion for contempt. Acting on that motion, Judge Benoit on December 16 found the Wellses in contempt of the settlement order and sentenced them to 10 days' imprisonment, based upon his belief that the Wellses had been able to make the payments to Adams but had failed to accord those payments proper priority. Upon the Wellses' representation that they would be able to pay off the entire debt in two months, Judge Benoit postponed the jail sentence until February 24, when the Wellses would be imprisoned if they had not by then paid the whole debt. The total amount of the debt was over $1,000; the aggregate amount overdue under the agreement on December 16 was less than $200.

On February 24 the Wellses appeared and the matter was continued until March 3. When March 3 arrived, the Wellses had not paid the debt, so Judge Benoit sent them to jail, based solely on their failure to pay the full sum, and without providing a hearing as to their then ability to pay the entire debt.

In *Wells v. State*, 474 A.2d 846 (Me. 1984), the Law Court reviewed on appeal the Wellses' petition for habeas corpus and concluded, based on the lack of a hearing on March 3 on their current ability to pay the debt, that Judge Benoit imprisoned them illegally. As clear as it was to the Law Court in that case that a hearing was required at the time of imprisonment, tensions between statutory provisions and the Law Court's earlier opinions may well have produced confusion as to the remedies that were available to a judgment creditor.[17] In that circumstance, we conclude that a reasonably prudent and competent judge

16. The facts of the *Wells* case appear fully in the Law Court's opinion in *Wells v. State*, 474 A.2d 846 (Me.1984), and need not be reiterated here. For clarity's sake, however, we set out the basic events as here relevant.

17. *Cf. Mitchell v. Flynn*, 478 A.2d 1133 (Me.1984) (later Law Court opinion demonstrating complexity in the law of contempt in these situations).

would not have felt that incarcerating the Wellses on March 3 was *obviously* wrong. Judge Benoit's action was judicial error, but it was not judicial misconduct.

### 2. *Denial of stays pending appeal*

Finally, the Committee alleges that Judge Benoit violated the Code of Judicial Conduct in three cases by denying the defendants' motions for stay of sentence pending appeal. Those denials may have involved judicial error, but they were not instances of judicial misconduct.

#### a. *State v. Johnston*

On the evidence before us, we find the following facts. In District Court (Skowhegan) defendant Russell Johnston entered a plea of guilty to a charge of criminal OUI on August 29, 1983. On that date, Judge Benoit accepted Johnston's guilty plea, continued the case for sentencing until September 19, and released Johnston on personal recognizance. On September 19, 1983, Judge Benoit sentenced Johnston to serve 30 days in jail and to pay a $500 fine, and suspended his license. Johnston's attorney immediately filed a notice of appeal with Judge Benoit and requested a stay of execution of the jail sentence pending the appeal. The judge denied the requested stay.

District Court Criminal Rule 38 provides: "A sentence of imprisonment shall be stayed if an appeal is taken *and* the defendant is admitted to bail pending appeal." (Emphasis added) In this case it is beyond question that the appeal was taken, but Johnston was not admitted to bail *after* the imposition of sentence. District Court Criminal Rule 46 governs bail and provides in part: "The defendant ... *may* be admitted to bail after conviction *and* pending appeal...." (Emphasis added) Although Judge Benoit continued bail after the guilty plea, that freedom ended when the judge sentenced Johnston to jail. No later bail was ever set. Thus, Johnston was not on

bail when his appeal was taken, and one condition for the stay under Rule 38 was not met.

Moreover, a District Court judge would not be obviously wrong in concluding that District Court Criminal Rule 46(a) leaves to his discretion whether to grant bail pending appeal. The previous Superior Court Criminal Rule 46(a), which was identical in language to the present District Court Criminal Rule 46(a), was so interpreted by our primary Maine treatise on criminal procedure.[18] As to the standard to be applied by the trial judge in exercising that discretion, that treatise states: "Generally, bail pending appeal need not be allowed if the appeal is not taken in good faith or is frivolous."[19] As applied to the *Johnston* case before Judge Benoit, the defendant had plead guilty and so had very limited grounds upon which to base an appeal. The 30-day sentence fell within the range allowed by law, and thus Judge Benoit could well view it as very unlikely that Johnston's appeal would succeed.

In these circumstances, Judge Benoit's denial of the motion for a stay of Johnston's jail term was not conduct that a reasonably prudent and competent judge would consider obviously and seriously wrong.

#### b. *State v. Hall*

On the evidence before us, we find the following facts. On May 26, 1982, defendant Everett Hall plead guilty in District Court (Skowhegan) to criminal charges of disorderly conduct and assault. For the disorderly conduct conviction, Judge Benoit sentenced Hall to pay a $300 fine by June 21, 1982, and for the assault conviction, sentenced him to serve eight days, on four consecutive weekends, in the county jail and pay a $300 fine by July 19, 1982. According to the District Court records, the bail set at the time of Hall's arrest was continued beyond sentencing only as to the

---

**18.** Glassman, *Maine Practice: Rules of Criminal Procedure Annotated* § 46.4 (1967). *See Fredette v. State,* 428 A.2d 395, 398–99 (Me.1981).

**19.** *Id.,* § 38.4, at 327.

**1170** ■

disorderly conduct charge. Hall appealed and moved to stay the jail sentence and the fines. Judge Benoit denied the motion.

The actions of Judge Benoit in this case do not rise to the level of a sanctionable violation of Canon 3 A(1). Examining the refusal to stay the jail sentence on the assault conviction, we note that Judge Benoit did not admit Hall to bail after sentencing in that case, and thus, as in *State v. Johnston,* one condition for stay pending appeal under Rule 38 was not met.

In reviewing the failure to grant a stay of execution of the fines, we are faced with unsettled issues of interpretation of the rules of criminal procedure that Judge Benoit now argues permitted his action. The District Court and the Superior Court have separate sets of criminal rules. However, some District Court rules provide that procedure in the District Court will be governed by the corresponding Superior Court rule. District Court Criminal Rule 38, controlling stays of execution of payment of fines, is such a rule. Most of the Superior court rules incorporated into the District Court rules make reference to actions to be taken by "the court." As applied in the District Court, "the court" plainly means the District Court. However, Superior Court Rule 38(b), incorporated into District Court Rule 38, states that in specified circumstances: "A sentence to pay a fine ... shall be stayed by the Superior Court...." Without here deciding the proper interpretation of the pertinent rules, we do recognize the existence of some question whether anyone other than a Superior Court judge could stay the execution of a District Court fine pending appeal. Thus, we cannot say that Judge Benoit's denial of the stays of the fines in *State v. Hall* was conduct that a reasonably purdent and competent judge would consider obviously and seriously wrong.

### c. *State v. Greene*

On the evidence before us, we find the following facts. In District Court (Skowhegan) on September 28, 1983, defendant Donald Greene admitted a charge that he had committed the civil traffic infraction of speeding. On the same day Judge Benoit sentenced him to pay a $120 fine and suspended his driver's license for 60 days. On October 4, 1983, Greene filed a notice of appeal and a request for a stay of execution of the license suspension based on District Court Civil Rule 62. Judge Benoit denied the request, stating, "[The appeal] is interposed for delay only." Several days later the Superior Court entered an order staying the execution of the license suspension pending appeal. On the merits of that appeal, the Superior Court affirmed the District Court decision, but gave Greene "a credit of seven days on his license suspension for that period in which defendant's license suspension should have been stayed."

■ District Court Civil Rule 62(e), which is made applicable to civil traffic infraction cases by Rule 80F(a) of the District Court Civil Rules, provides in part:

[T]he taking of an appeal from a judgment shall operate as a stay of execution upon the judgment during the pendency of the appeal....

The District Court Civil Rules thus declare that the filing of a notice of appeal in a civil case, such as *State v. Greene,* operates automatically to stay execution upon the judgment, without any judicial action. When Greene's attorney asked Judge Benoit to order a stay pending appeal, he sought a meaningless and needless act and implied by his request that he believed Judge Benoit had discretion in the matter. We cannot say in these circumstances that a reasonably prudent and competent judge would consider Judge Benoit's reaction to the request to be obviously and seriously wrong.

### III. *Sanction*

■ The Supreme Judicial Court, as the only court established by our state constitution, has the inherent power to prescribe the conduct of judges of all the courts, and to discipline judges for their acts that violate the Code of Judicial Conduct. *Matter*

*of Ross*, 428 A.2d 858, 868 (Me.1981). In *Board of Overseers of the Bar v. Lee*, 422 A.2d 998, 1002 (Me.1980), the Law Court discussed this broad inherent power of the Supreme Judicial Court to regulate the conduct of officers of the court.[20] In *Lee* the Law Court ruled that each of the three branches of government is supreme within the legitimate and appropriate sphere of its action, and that

> [each branch] has, without any express grant, the inherent right to accomplish all objects necessarily within the orbit of that department when not expressly allocated to, or limited by the existence of a similar power in, one of the other departments. The inherent power of the Supreme Judicial Court, therefore, arises from the very fact that it is a court and connotes that which is essential to its existence and functioning as a court.

By enacting 4 M.R.S.A. § 1 (1979), the legislature has recognized the inherent power of the Supreme Judicial Court to regulate the judiciary. That statute provides:

> The Supreme Judicial Court shall have general administrative and supervisory authority over the Judicial Department and shall make and promulgate rules, regulations and orders governing the administration of the Judicial Department.

Similarly, 4 M.R.S.A. § 7 (1979) provides in part:

> [The Supreme Judicial Court] has general superintendence of all inferior courts for the prevention and correction of errors and abuses where the law does not expressly provide a remedy....

The court's power to create and prescribe the rules relating to the Committee on Judicial Responsibility and Disability has been recognized by the legislature as well. 4 M.R.S.A. § 9–B (Supp.1984–1985).

■ We agree completely with the statement of the Supreme Judicial Court of Massachusetts outlining its power to take action on alleged instances of judicial misconduct.

> The power, authority, and jurisdiction of this court to make the inquiry and to hold hearings rest on at least the following grounds, among others: (a) the inherent common law and constitutional powers of this court, as the highest constitutional court of the Commonwealth, to protect and preserve the integrity of the judicial system and to supervise the administration of justice; (b) the supervisory powers confirmed to this court by [statute]; (c) the power of this court to maintain and impose discipline with respect to the conduct of all members of the bar, either as lawyers engaged in practice or as judicial officers; and (d) the power of this court to establish and enforce rules of court for the orderly conduct (1) of officers and judges of the courts and (2) of judicial business and administration.

*In re DeSaulnier*, 360 Mass. 757, 758–59, 274 N.E.2d 454, 456 (1971).

Moreover, it is essential for the efficient provision of even-handed justice for the people of Maine that this court have the power to sanction judges who violate the Code of Judicial Conduct. The Maine Constitution provides that judges may be removed by "impeachment or by address of both branches of the Legislature to the executive." Impeachment and address are too cumbersome and too severe to be the only sanctions available for judicial discipline. They are so difficult to effect that the other branches might be hesitant to undertake them. Especially is this so, since they can lead only to the ultimate sanction of removal, which will not be warranted in the vast majority of discipline cases, including the present one. We thus are keenly aware of the benefit to the judiciary and to the public from this court's power to discipline judges with a sanction less than removal. In a judicial discipline case, the Supreme Court of our neighbor-

---

**20.** *Lee* dealt with the power of this court to regulate attorneys as officers of the court. Plainly judges are even more significant officers of the court than are lawyers.

ing state of New Hampshire has declared with particular pertinence here: "It has never been the tradition of the jurisprudence of this court to refuse to exercise judicial power when there was an established need for it and there was no constitutional barrier to its exercise." *In re Mussman*, 112 N.H. 99, 103, 289 A.2d 403, 405–06 (1972).

■ As that court noted, and as the Law Court also noted in *Board of Overseers of the Bar v. Lee*, 422 A.2d at 1002, the inherent power of the Supreme Judicial Court may be, however, limited by the state constitution. In the case at bar, Judge Benoit argues that the compensation clause of article VI, section 2 of our constitution [21] is such a limitation and prevents this court from ordering suspension without pay or imposing any other monetary sanction for judicial misconduct. We reject that argument. The history of the compensation clause does not reveal any intention to limit the inherent power of the Supreme Judicial Court.

■ The drafters of the Maine Constitution mandated a strict separation between the legislative, executive, and judicial branches of government. *State v. Hunter*, 447 A.2d 797 (Me.1982). Article III of the constitution provides in full:

Section 1. The powers of this government shall be divided into three distinct departments, the legislative, executive and judicial.

Section 2. No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.

The drafters especially intended that an independent judiciary interpret and administer the laws of the state. In their address to the people of Maine, the delegates to the Constitutional Convention of 1819 expounded:

On a pure, intelligent, upright, and independent judiciary, the people more immediately depend for the impartial interpretation and administration of the laws, and for protection in the enjoyment of their rights and privileges.

Debates and Journal of the Constitutional Convention of the State of Maine (1819–1820) 109–10 (1894).

■ It is within that framework that we interpret our constitutional provision that judges' compensation "shall not be diminished during their continuance in office." Me. Const. art. VI, § 2. The legislature sets judges' salaries and appropriates the funds to pay them. It is apparent that the compensation clause constitutes a constitutional mandate that the legislature fix salaries to be payable to judges "at stated times" and that the *legislature* not diminish that compensation during their continuance in judicial office. Article VI, section 2 prohibits only legislative action.

The original understanding of the purpose of the nearly identical compensation clause of the United States Constitution,[22] from which Maine's compensation clause is directly derived,[23] confirms the fact that

---

21. *Me. Const. art VI, § 2 reads in full:*

The Justices of the Supreme Judicial Court and the Judges of other courts shall, at stated times receive a compensation, which shall not be diminished during their continuance in office; but they shall receive no other fee or reward for their services as Justices or Judges.

22. Art. III, § 1 of the United States Constitution provides in pertinent part:

The Judges, both of the supreme and inferior Courts, ... shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

23. Although the Maine Constitutional Convention of 1819 looked to the 1780 Constitution of the Mother Commonwealth as a model for many provisions, R. Banks, *Maine Becomes a State* 153–54 (1970), Massachusetts had nothing that could have served as a model for Maine's compensation clause. The closest the 1780 Massachusetts Constitution came to this subject was in the provision appearing in article XXIX of the Declaration of Rights, "that the judges of the supreme judicial court ... should have honorable salaries ascertained and established by

those clauses are designed to protect the separate Third Branch from the legislative powers of the purse. In Federalist Paper No. 79, Alexander Hamilton explained the rationale for the compensation clause in the federal constitution:

In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realized in practice, the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter. ... The plan of the convention accordingly has provided that the judges of the United States "shall at *stated times* receive for their services a compensation which shall not be *diminished* during their continuance in office."

... The salaries of judicial officers may from time to time be altered, as occasion shall required, yet so as never to lessen the allowance with which any particular judge comes into office, in respect to him.

(Emphasis in original)

In interpreting a similar compensation clause in the New York Constitution, that state's Court on the Judiciary wrote:

Adopted to guarantee the separation of powers between the judicial and legislative branches of government by insulating the judiciary from the influence that might be exercised by the Legislature through its powers over the expenditure of public funds, it was designed solely to prevent legislation reducing the Judge's salary during his term of office.

*Matter of Pfingst,* 33 N.Y.2d ( ), (aa) (Ct. Jud.1974), *aff'd,* 393 N.Y.S.2d 803 (3d Dept. 1977).

■■■ The compensation clause in the Maine Constitution similarly protects judges from being influenced by the legislature's power of the purse. Article VI, section 2 does not, however, prevent the

Supreme Judicial Court from imposing a monetary sanction as a matter of internal judicial discipline. Although the Supreme Judicial Court should resort only sparingly to *any* judicial disciplinary sanction, including a monetary one, we reject any notion that the compensation clause was intended to give any judge, including a judge of this court, "judicial independence" from the Supreme Judicial Court. "We see no conflict between judicial independence and judicial accountability." *Matter of Ross,* 428 A.2d at 861. The fair inference from our governmental structure is that the compensation clause specifically reinforces the separation of powers between the Legislative and the Judicial Branches, but does not limit the Supreme Judicial Court in maintaining within its domain appropriate standards of judicial conduct. As the ultimate sanction for judicial misconduct, the legislature may exercise powers of impeachment or address to remove a judge, but the imposition of any lesser discipline falls necessarily within the responsibility of this constitutionally created court. We cannot discern in the compensation clause any intention to restrict the Supreme Judicial Court from use of any appropriate sanction as judicial discipline imposed internally to the Judicial Branch.

Judge Benoit violated Canon 3 A(1), as well as Canon 2 A, of the Code of Judicial Conduct by his clearly illegal and unfair actions in the *Tessin, Wickham,* and *Heaton-Jones* cases. In the same circumstances, a reasonably prudent and competent judge would consider Judge Benoit's actions in each of those cases to be obviously and seriously wrong.

In turning to the question of what specific sanction is appropriate to impose for that judicial misconduct, we repeat the following pertinent comment from our opinion in *Matter of Ross,* 428 A.2d at 868–69:

The purpose of sanctions in cases of judicial discipline, as in cases of lawyer discipline, is not vengeance or retribution. Those concepts have no place in a

standing laws." R. Perry, ed., *Sources of Our*     *Liberties* 377 (rev. ed. 1978).

disciplinary system designed to assure the orderly administration of justice in the public interest. Any sanction must be designed to preserve the integrity and independence of the judiciary and to restore and reaffirm the public confidence in the administration of justice. Any sanction must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future. Thus, we discipline a judge to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that the judicial misconduct is neither permitted not condoned. We discipline a judge to reassure the public that the judiciary of this state is dedicated to the principle that ours is a government of laws and not of men.

Those purposes will be served in the case at bar only by a significant sanction. In *Tessin, Wickham,* and *Heaton-Jones,* Judge Benoit illegally exercised the profound judicial power of imprisonment. He incarcerated each defendant for a period of more than 30 days in the absence of any criminal conviction and without any procedural safeguards. That illegal and unfair exercise of judicial power automatically becomes a matter of special seriousness. Tessin and Wickham, charged by the State with only civil traffic infractions, were, after admitting those infractions, obligated at most to pay the State civil fines; and the juvenile Heaton-Jones, who had been in the custody of his mother for three months, was yet to get a hearing on the merits of the juvenile charges against him. All three incidents occurred within the relatively short time span between June 1983 and February 1984. It is no answer that the caseload carried by District Court judges is a heavy one; the wrongs committed in *Tessin, Wickham,* and *Heaton-Jones* are so obvious and so serious that they cannot be excused as representing merely the negligent oversight of the commands of the law under the pressures of a hurried schedule.

■ To defend his action Judge Benoit points to his alleged good faith interpretation of the powers of a judge in dealing with persons appearing before him. Good faith, however, cannot immunize from judicial discipline any conduct that a reasonable prudent and competent judge would consider obviously and seriously wrong. Judge Benoit knew or plainly ought to have known that he was going seriously beyond the law in incarcerating Tessin, Wickham, and Heaton-Jones.

In selecting the appropriate sanction we are fully conscious of the absence here of the slightest hint that the judge's action was motivated by personal gain or benefit. Also, from our general oversight of the Judicial Department, we know of Judge Benoit's reputation for hard work and of his efforts outside the courtroom to educate students and other members of the public about the courts. We believe that Judge Benoit has continued potential for valued service on the bench, provided that repetition of incidents similar to those here censured is deterred. Our judgment today has that future service as one of its goals.

The sanction we impose must include a public censure; and this opinion, to be published in the same manner as a Law Court opinion, does constitute a censure of severe consequence to a sitting judge. Additionally, a disciplinary suspension from the performance of judicial duties for a period subsequent to the date of this decision is appropriate. Such suspension is now imposed for disciplinary purposes after full hearing and decision on the merits of the charges brought before this court by the Committee. Finally, in order to emphasize the gravity of the misconduct in the *Tessin, Wickham,* and *Heaton-Jones* cases, we conclude that a monetary sanction of $1,000, recoverable from the judge's salary, is in order.

Upon full consideration of the premises, it is ADJUDGED that Judge John W. Benoit, Jr., has violated Canons 2 A and 3 A(1) of the Code of Judicial Conduct.

It is ORDERED that he be, and he hereby is, censured for those violations. It is FURTHER ORDERED that he be, and he hereby is, suspended from the performance of his duties as a judge of the District Court until March 1, 1985, and that, prior to April 1, 1985, he forfeit the amount of $1,000 from the salary otherwise payable to him.

All concurring.