In the matter of the proceedings pursuant to AS 22.30.011(b) in relation to Dale O. CURDA, Judge of the Superior Court, Fourth Judicial District, at Bethel, Alaska, Petitioner.

No. S–9907.

Supreme Court of Alaska.

June 21, 2002.

Jonathon A. Katcher, Pope & Katcher, Anchorage, Brennan P. Cain, Middleton & Timme, Anchorage, for Petitioner.

Matthew D. Jamin, Jamin, Ebell, Schmitt & Mason, Kodiak, Special Counsel to the Alaska Judicial Conduct Commission.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

I.W., subpoenaed to testify in Wilfred Raphael's criminal trial in Bethel, arrived in court intoxicated on the day she was scheduled to give testimony. In an ex parte meeting, Assistant District Attorney Joe Wrona expressed concern to Superior Court Judge

Dale. Curda that I.W. would either fail to appear a second time to testify or would not be able to stay sober. After holding a brief hearing with Wrona and I.W., Judge Curda imprisoned I.W. for contempt. The Judicial Conduct Commission has recommended to this court that Judge Curda be reprimanded for ethical misconduct based on legal errors committed in that contempt proceeding.

Judge Curda committed legal errors that violated some of I.W.'s and Raphael's rights. But because Judge Curda's legal errors were neither willful nor part of a pattern of misconduct, we conclude that they did not constitute ethical misconduct and therefore that he should not receive any sanction.

## I. FACTS AND PROCEEDINGS

I.W. was subpoenaed and scheduled to testify in Bethel on Tuesday, September 5, 1995, at the trial of Wilfred Raphael—her former domestic companion who had been indicted for a series of serious attacks upon her. Assistant District Attorney Joe Wrona arranged for I.W. to be flown in from Mountain Village on Monday and to stay in Pacifica House, a placement that did not allow alcohol on the premises. I.W.'s two children accompanied her to Bethel. Wrona instructed I.W. to remain sober, telling her that she would "get in trouble" if she did not.

On Tuesday morning, Raphael's lawyer, James Gould, notified the court by telephone from Anchorage that he was too sick to travel to Bethel that day. Judge Curda, who was presiding over Raphael's trial, continued the trial until the next day.

Wrona then learned that I.W. had been evicted from Pacifica House for drinking and "partying" in her room. Wrona's supervisor instructed him to tell Judge Curda about his witness problem. When Wrona arrived at the court, he encountered I.W., still intoxicated, pulling up in a taxi with her children. After talking briefly with I.W., Wrona went into the courtroom to meet with Judge Curda; I.W. remained behind in the foyer.

After Judge Curda directed that the proceedings be put on the record, Wrona explained his problem to Judge Curda, stating that he felt he could not "control" I.W. Wro-

na presented Judge Curda with three potential options: (1) confining I.W. for contempt; (2) sending I.W. home and bringing her back when trial resumed; or (3) keeping I.W. in Bethel if the court could shape some other sort of remedy.

As Wrona had told him that I.W. was a recalcitrant witness and that she had threatened not to testify if her testimony was not taken that day, Judge Curda decided that they could not send I.W. home. Judge Curda also found that I.W. could not safely remain in Bethel outside of custody, because her children lacked an appropriate placement there. He thus concluded that I.W. would likely have to be confined, and her children taken into custody by the Division of Family and Youth Services (DFYS). Although he stated "I've never found that . . . me talking to someone, especially when they're under the influence is going to make any difference whatsoever," Judge Curda called I.W. into the courtroom to question her.

Judge Curda asked I.W. if she had been subpoenaed to testify; if she had been evicted from Pacifica House; if she had been drinking; and if she was currently under the influence. I.W. responded that she was under subpoena; that she had left—not been evicted from—Pacifica House; that she had "perhaps" been drinking; but that she was not currently intoxicated. I.W. then admitted, however, that she had been intoxicated earlier. Meanwhile, Judge Curda concluded that I.W. was too intoxicated to drive or to testify in a criminal trial. He asked I.W. if it was too hard for her to stay sober while in Bethel and what the court could do to help her remain sober. I.W. responded that she could stay sober. Judge Curda responded: "It's not . . . just about you being sober for this case, I mean, you need to be sober for your kids to keep your kids safe whatever happens with the case and also to keep yourself safe." I.W. in turn stated that she had a room at the Kusko Inn; however, Judge Curda responded that that would not work as it was "just not a good place." When I.W. then proposed staying at the Women's Shelter, Wrona reminded her that she would have to remain sober there and that "if there's one little problem, you're going to get thrown in

jail and your kids will get taken away from you." When Wrona continued, "We're here today trying to think of ways to not do that to you," I.W. responded that Wrona had lied to her by telling her that they would be able to get her testimony in the trial over with that day.

Following a confused series of exchanges, Judge Curda told I.W. that as she hadn't been able to remain sober in town, even with her children accompanying her, he was holding her in contempt and "remanding" her. This, he said, was the only viable solution for securing her protection, her children's protection, and her testimony. At the conclusion of these proceedings, Judge Curda stated that when I.W. gave her testimony, "then we'll revisit the case and presumably let her, she'll be able to be released." Judge Curda then arranged for a social worker from DFYS to be called to take custody of the children.

Because of Raphael's defense attorney's illness, the trial ultimately did not resume until Thursday. I.W. testified on Friday morning, but because Wrona indicated that he might need her as a rebuttal witness, she was not released until Friday afternoon.

Raphael was ultimately convicted, and his conviction was upheld by the court of appeals despite a concurrence by Judge Mannheimer that was strongly critical of Judge Curda's treatment of I.W.[1] This court, in a divided opinion, reversed the judgment of the court of appeals, concluding that Raphael's right to be present at every stage of the trial and his due process rights had been violated.[2]

The Judicial Conduct Commission subsequently investigated Judge Curda's actions and held a formal disciplinary hearing. Five

1. *Raphael v. State* (*Raphael I* ), 1998 WL 191159 (Alaska App.1998), *reversed by Raphael v. State* (*Raphael II* ), 994 P.2d 1004 (Alaska 2000).

2. *Raphael v. State* (*Raphael II* ), 994 P.2d 1004 (Alaska 2000).

3. *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000); *In re Inquiry Concerning A Judge* (*Judge I* ), 762 P.2d 1292, 1296 n. 4 (Alaska 1988).

4. *Johnstone*, 2 P.3d at 1234; *In re Hanson*, 532 P.2d 303, 308 (Alaska 1975).

5. Special Counsel's case is based primarily on Canon 3(A)(4) of the Code of Judicial Conduct,

members of the Commission concluded that Judge Curda had violated provisions of the Judicial Code during the I.W. contempt hearing; three members concluded that he had not. Only three of the Commissioners, however, felt that a public reprimand was appropriate. Two felt a private reprimand was appropriate, and three felt that if Judge Curda's actions were found to violate the Code, the appropriate level of discipline would be, at most, a private reprimand. The Commission filed a recommendation for a private reprimand before this court, a recommendation which Judge Curda opposes in his petition.

## II. DISCUSSION

### A. Standard of Review

■ Both Judge Curda and the Special Counsel for the Commission agree that this court should conduct a de novo review of the alleged judicial misconduct and the recommended sanction.[3] In doing so, we recognize that judicial misconduct must be established by clear and convincing evidence.[4]

### B. Judge Curda Committed Legal Errors in the Contempt Proceedings at Issue.

Judge Curda argues that he should not be disciplined for this single incident in which he made unintentional legal errors. Special Counsel, by contrast, contends that Judge Curda's legal errors were sanctionable because they denied I.W. and Raphael fundamental procedural rights. Such errors, argues Special Counsel, constituted a violation of Judge Curda's ethical duties even if they were unintentional.[5]

which bars ex parte proceedings "except as authorized by law," and requires a judge to give each person legally interested in a proceeding a full right to be heard "according to law." In addition, Judge Curda is charged with violating Canons 3(A)(1), 2(A), and 1. Canon 3(A)(1) requires a judge to be "faithful to the law and maintain professional competence in it [as well as to be] ... unswayed by partisan interests, public clamor, or fear of criticism;" Canon 2(A) requires a judge to "respect and comply with the law and ... conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary;" and

We conclude that Judge Curda did violate I.W.'s right to notice and a meaningful hearing, as well as Raphael's due process rights and right to be present at every stage of his trial.

■ The Alaska rules governing contempt proceedings require that I.W. be given a meaningful hearing regarding her alleged contempt and what was to be done about it. Unstated, but necessary, procedures governing the detention of a material witness also require a meaningful hearing.[6] Judge Curda gave I.W. a hearing of sorts before holding her in contempt and ordering her remanded; however, Judge Curda gave I.W. no advance notice that she stood accused of contempt, and his questioning of I.W. in her intoxicated state did not allow her a meaningful opportunity to be heard. During his questioning, Judge Curda determined that I.W. was too intoxicated to testify. If she was too intoxicated to testify, it follows that she was also too intoxicated to participate meaningfully in a hearing concerning the sanction for her contempt. While this does not mean that Judge Curda had to immediately release I.W., it does mean that he should have given her notice of the purpose of the proceeding and brought her back before the court as soon as she was sober, so that, at least, she could have been heard on the question of the continuing need for her confinement.

■ As to Raphael, this court has previously held that the ex parte hearing in this case violated Raphael's right to be present at every stage of his trial—a right guaranteed by Criminal Rule 38(a).[7] In addition, we held that it was a violation of Raphael's due process rights for Judge Curda to allow the impression that I.W.'s freedom and continued custody of her children was contingent upon the nature of her testimony.[8] We continue to adhere to these views.

### C. Judge Curda's Legal Errors Were Not Ethical Violations.

In order to help us determine the relationship between legal error and ethical violation, we look to the decisions of other state courts. The California Supreme Court has decided, in the interests of safeguarding the independence of the judiciary, that "mere legal error" is insufficient to support a finding of ethical misconduct.[9] However, that court went on to hold that legal error may constitute ethical misconduct when it clearly and convincingly reflects bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty.[10] Commentators have expressed similar views, concluding that legal error may amount to judicial misconduct if it is repeated, motivated by bad faith, accompanied by intemperate or abusive conduct, or irremediable by appeal.[11] Our review of case law from other jurisdictions indicates that courts most often find judicial misconduct where judges have repeatedly or willfully denied individuals their rights. Indeed, commentators have stated that most cases of judicial misconduct of this type involve both repeated and knowing violations of rights,

---

Canon 1 requires a judge to uphold the integrity and independence of the judiciary.

**6.** The proceedings that resulted in I.W.'s incarceration could be characterized as direct contempt proceedings governed by Civil Rule 90(a), indirect contempt proceedings governed by Civil Rule 90(b), or material witness detention proceedings effecting the express and implied principles and requirements of AS 12.30.050. The proceeding that is least protective of an individual's rights is that for direct contempt. *See Raphael II*, 994 P.2d at 1013, n. 39. But even in direct contempt proceedings a contemnor is entitled to a meaningful opportunity to be heard concerning the need for the sanction. In the other two cases—indirect contempt and material witness detention—the individual must be given

notice of the character of the proceedings and the specific reasons why they are being brought, in addition to a meaningful opportunity to be heard.

**7.** *Raphael II*, 994 P.2d at 1012–13.

**8.** *Id.* at 1010.

**9.** *Oberholzer v. Comm'n on Judicial Performance*, 20 Cal.4th 371, 84 Cal.Rptr.2d 466, 975 P.2d 663, 680 (1999).

**10.** *Id.*

**11.** Jeffrey M. Shaman et al., Judicial Conduct and Ethics (3d ed.2000) § 2.02, at 37–38.

thus "evidencing a pattern of misconduct." [12]

In *Matter of Scott*, the Massachusetts Supreme Court noted the "difficulty in distinguishing between mere errors ... on the one side, which would not call for discipline, and, on the other side, what we have called patterns of disregard or indifference, which do warrant discipline." [13] The court further stated that it was willing to consider disciplining a judge where "it [had been] established by credible evidence that [the] judge, over a protracted period of time, [had] followed a course of judicial conduct which [was] in utter disregard of the law and of established rules of practice in continued violation of orders pertaining thereto...." [14] The court there decided to discipline Judge Scott for her "pattern of disregard of, or indifference to, fact or law, largely in criminal and juvenile cases," [15] but in doing so warned that "[t]o invoke the disciplinary power of this court against a judge as a substitute for appellate review would establish a practice dangerous to the independence of the judiciary and equally dangerous to the public's constitutional right to an independent judiciary." [16]

Several other cases support distinguishing between mere legal error and patterns of repeated error. In *Matter of Reeves*, the New York Court of Appeals upheld the decision of the State Commission on Judicial Conduct to discipline Judge Reeves for his "repeated pattern of failing to advise litigants of their constitutional and statutory rights." [17] That court noted that the purpose of judicial sanction was not to punish the judge, but instead to safeguard the bench. [18] The court held that "the errors [committed by Judge Reeves] were fundamental and the pattern of repeating them, coupled with an unwillingness to recognize their impropriety, indicate[d] that [Judge Reeves] pose[d] a threat to the proper administration of justice." [19] Similarly, in *In re Inquiry Concerning Perry*, the Florida Supreme Court publicly reprimanded a judge for repetitively abusing his contempt power. [20] There, Judge Perry had intemperately incarcerated six defendants for indirect contempt without following appropriate procedures for such proceedings, and had set unreasonably high bail for two defendants to punish their refusal to enter immediate guilty pleas. [21]

The Supreme Court of Maine used a slightly different standard to determine judicial misconduct in *Matter of Benoit*. [22] While consistent with the above cases in its recognition that "[e]very trial judge will from time to time commit legal errors," and that "judicial discipline would be in order in almost none of those cases," [23] the Maine Supreme Court held that "judicial conduct constitutes a violation of [judicial canons] if a reasonably prudent and competent judge would consider that conduct obviously and seriously wrong in all the circumstances." [24] In that case the court censured and suspended Judge Benoit for a pattern of "obviously and seriously wrong" practices. [25] These practices included unlawfully imposing bail on an indigent defendant, where such imposition resulted in the defendant's imprisonment for over a month for a civil traffic infraction; unlawfully imprisoning a second defendant for failing to pay a civil fine; and detaining a juvenile defendant for six weeks without taking any evidence and without affording the juvenile his right to counsel. [26]

12. *Id.* at § 2.10, at 55.

13. 377 Mass. 364, 386 N.E.2d 218, 220 (1979).

14. *Id.* at 220–21.

15. *Id.* at 220.

16. *Id.*

17. 63 N.Y.2d 105, 480 N.Y.S.2d 463, 469 N.E.2d 1321, 1323 (1984).

18. *Id.*

19. *Id.*

20. 641 So.2d 366 (Fla.1994).

21. *Id.* at 367–68.

22. 487 A.2d 1158 (Me.1985).

23. *Id.* at 1162.

24. *Id.* at 1163.

25. *Id.* at 1164.

26. *Id.* at 1164–69.

Judge Curda's legal errors here were not comparable to those in the above cases. While the judges in the above matters were disciplined for patterns of repeated misconduct, Judge Curda is charged with legal errors arising out of a single instance. In addition, Judge Curda showed none of the willfulness present in other cases in which judges were found to have committed ethical violations.

In one case of willful misconduct—*Matter of Yengo*—the New Jersey Supreme Court removed Judge Yengo for his repeated failure to advise defendants of their constitutional rights, for imprisoning defendants either without a proper hearing or based upon inadmissible evidence, for using bail as an arbitrary weapon to harass defendants, and for disregarding and mocking controlling legal precedent with which he disagreed.[27] Indeed, the court found that Judge Yengo "seemed to relish his judicial power to imprison. others than defendants," [28] and that he "seem[ed] unable to understand the relationship between justice and the defendant." [29] Similarly, in *Matter of Ross,* the Supreme Court of Maine suspended Judge Ross for willfully disregarding the law in intemperately sentencing a defendant to jail for a civil violation and for imprisoning another party without conducting a hearing.[30]

In contrast to the examples above, Judge Curda's commission of legal errors was not willful. Indeed, of the cases reviewed by this court, the one that most closely resembles Judge Curda's is *Matter of Thomson,*[31] decided by the New Jersey Supreme Court. In *Matter of Thomson,* a municipal court judge jailed a defendant on charges of shoplifting and possession of stolen property without

individually advising the defendant of his right to counsel,[32] placing either the defendant or the testifying police officer under oath, or explaining to the defendant the reasons for his sentence as required by New Jersey law.[33] As explanation for his legal errors, the judge stated that he had never faced such a situation before. The judge claimed that the defendant had been "virtually uncontrollable," blurting out the charge against him, admitting his guilt, and then relaying the details of the incident. The judge explained that he believed the defendant would not return to court when instructed to do so, and that he would represent a danger to himself and others if not taken into custody.[34] Within hours of sentencing the defendant, the judge took steps to alert the probation department to the defendant's apparent problems; however, by that time the defendant had already hanged himself.[35]

The New Jersey Supreme Court concluded that the judge exercised "poor judicial judgment" and committed a "serious" transgression. The court emphasized that "[d]espite the best of motives a judge cannot try to decide what is best for a defendant, as distinct from what he knows is constitutionally required. To do so is to depart from his or her role as a judge." [36] The court went on, however, to note that the judge's incorrect rulings had been appealable, and that incorrect rulings—even with respect to a defendant's constitutional rights—normally should not subject a judge to charges of judicial misconduct.[37] The court also stated that "[t]here were, and still are, no guidelines in existence for the type of situation [involving an apparently unstable defendant] in which [the judge] found himself," and unanimously concluded—in light of the "unique circum-

27. 72 N.J. 425, 371 A.2d 41, 49–51 (1977).

28. *Id.* at 53.

29. *Id.* at 56.

30. 428 A.2d 858, 862–63 (Me.1981).

31. 100 N.J. 108, 494 A.2d 1022 (1985).

32. The judge read out a general statement of defendants' rights at the beginning of court, as was apparently general practice in many municipal courts; perhaps because the judge's regular court clerk was not present, the judge was un-

aware that the defendant was not present when the statement of rights was read. *Id.* at 1023–24, 1025 n. 2, 1026 n. 3.

33. *Id.* at 1025–26.

34. *Id.* at 1026–27.

35. *Id.* at 1025.

36. *Id.* at 1027.

37. *Id.*

stances present in this case, the difficult position in which [the judge] found himself, the time pressure under which [the judge] was required to act, and [the fact] that this matter represent[ed] a single unfortunate instance in [the judge's] long and otherwise unblemished professional record"—that the judge had not committed ethical misconduct.[38]

 Here, with regard to his treatment of I.W., Judge Curda—like Judge Thomson—committed a single deprivation of an individual's constitutional rights, motivated by good faith concerns for orderly trial proceedings and the affected individual's well-being, in the face of a unique situation [39] for which there was no available legal template.[40] As Judge Curda argued, this court is aware of "no contested American case approv[ing] the disciplining of a judge for a single incident of good faith legal error when the judge acted without animus."

As the cases discussed above recognize, all judges make legal errors. Sometimes this is because the applicable legal principles are unclear. Other times the principles are clear, but whether they apply to a particular situation may not be. Whether a judge has made a legal error is frequently a question on which disinterested, legally trained people can reasonably disagree. And whether legal error has been committed is always a question that is determined after the fact, free from the exigencies present when the particular decision in question was made.

Further, judges must be able to rule in accordance with the law which they believe applies to the case before them, free from extraneous considerations of punishment or reward. This is the central value of judicial

independence. That value is threatened when a judge confronted with a choice of how to rule—and judges are confronted with scores of such choices every day—must ask not "which is the best choice under the law as I understand it," but "which is the choice least likely to result in judicial discipline?"

For these reasons, we agree with those authorities discussed above that hold that legal error that is neither willful nor part of a repeated pattern of misconduct is not an appropriate subject for discipline.

In light of this standard we conclude that Judge Curda's treatment of I.W. is not properly subject to ethical sanction because the errors he made were neither repeated nor willful. The same conclusion applies to Judge Curda's denial of Raphael's procedural rights. We note that prior to this court's decision in *Raphael II*, the court of appeals unanimously concluded that the ex parte proceedings did not violate Raphael's right to be present.[41] The fact that reasonable judges could and did differ over whether the ex parte proceedings violated Raphael's rights underscores the difficulty and uncertainty of the situation with which Judge Curda was presented.

## III. CONCLUSION

Because Judge Curda's legal errors as to I.W. and Raphael were not willful nor part of a pattern of judicial misconduct, we conclude that they were not ethical violations of the Code of Judicial Conduct. Therefore, Judge Curda should not be reprimanded.

---

**38.** *Id.* at 1027–28.

**39.** Judge Curda testified that I.W. was the first person he had ever incarcerated for contempt.

**40.** Judge Richard Savell, one of Alaska's most experienced superior court judges, testified that the law involving the treatment of intoxicated witnesses was "murky." Our research confirms this, for there are no Alaska cases on the subject, there is little authority elsewhere, and that which we have found is not consistent. *Commonwealth v. Clark*, 13 Pa. Commw. 439 (1893) (quoted in *Commonwealth ex rel. Falwell v. Di Giacinto*, 324 Pa.Super. 200, 471 A.2d 533 (1984)), indicates

that a drunken witness is guilty of contempt. But in *Cameron v. State*, 102 Md.App. 600, 650 A.2d 1376 (Md.1994), the court stated: "We have found no cases, nor are any cited by the parties, in which the court has found a defendant, who is admittedly an alcoholic, in contempt of court merely for appearing in court in an intoxicated condition." *Id.* at 1380. *See also* Joan Teshima, *Intoxication of Witness or Attorney as Contempt of Court*, 46 A.L.R.4th 238 (1986), for discussion of the various holdings that exist on this issue.

**41.** *See Raphael I,* 1998 WL 191159 at *5.