449 S.E.2d 277

**The COMMITTEE ON LEGAL ETHICS OF THE WEST VIRGINIA STATE BAR, Complainant,**

v.

**Mark A. KARL, a Member of the West Virginia State Bar, Respondent.**

**No. 22172.**

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1994.

Decided July 20, 1994.

---

**11.** *But see* note 9, *supra.*

**12.** *See supra* note 1.

Sherri D. Goodman, Bar Counsel, The West Virginia State Bar, Charleston, for complainant.

David A. Jividen, James B. Stoneking, Bordas, Bordas & Jividen, Wheeling, for respondent.

McHUGH, Justice:

In this disciplinary proceeding, the Committee on Legal Ethics of the West Virginia State Bar (hereinafter "the Committee") recommends that this Court suspend the law license of the respondent, Mark A. Karl, a member of the Bar sitting as a Circuit Judge in the Second Judicial Circuit since January, 1993, for a period of six months and assess the costs of the proceeding against the respondent. This recommendation is based upon the Committee's finding that the respondent displayed a pattern of neglect of his legal tasks and in communications with his

clients, their new attorneys and Bar Counsel in three matters: (1) as title counsel for the Marshall County Sewerage District in the Washington Lands Projects; and as lawyer for (2) Thomas A. Drescher and (3) Samuel J. Scott.

■ This Court's standard for evaluating recommendations of the Committee regarding the suspension of a lawyer for ethical violations is stated in syllabus point 1 of *Committee on Legal Ethics v. Lewis*, 156 W.Va. 809, 197 S.E.2d 312 (1973):

> In a court proceeding prosecuted by the Committee on Legal Ethics of the West Virginia State Bar for the purpose of having suspended the license of an attorney to practice law for a designated period of time, the burden is on the Committee to prove by full, preponderating and clear evidence the charges contained in the complaint filed on behalf of the Committee.

*See also Committee on Legal Ethics v. Keenan*, 189 W.Va. 37, 427 S.E.2d 471 (1993); *Committee on Legal Ethics v. Charonis*, 184 W.Va. 268, 400 S.E.2d 276 (1990).

I

THE WASHINGTON LANDS PROJECT

In 1979, the three-member Board of the Marshall County Sewerage District (hereinafter "the Board") retained the respondent as title counsel for the Sewerage District on an ongoing basis. In 1987, John L. Blair, Jr., the Chairman of the Board, asked the respondent to prepare easements in the Washington Lands Wastewater Management Project (hereinafter "the Project"). The Project, undertaken by the District, involved the installation of a sewage treatment plant and sewer system in the Washington Lands area of Marshall County, serving approximately 130 residents. The actual construction of the sewer system began in 1987 and was completed in the spring of 1988.

The exact nature of the respondent's responsibilities is in dispute. Mr. Blair contends that the respondent was expected to draw up, have executed and record easements where sewer pipes crossed private property upon receiving a list of sites where easements were needed from Project engi-

neers. The respondent contends that he was responsible only for recording the easements. He maintains it was the duty of District employees to obtain signatures of the affected landowners and return the easements to the respondent for recording.

The respondent failed to record a single one of the 68 executed easements he received from Project engineers. The respondent also failed to obtain executed easements for 52 sites. In a letter dated October 29, 1988, Mr. Blair requested that the respondent immediately record all easements, noting that the easements should have been recorded several months earlier. The respondent furnished no reply. On January 16, 1989, Mr. Blair again wrote to the respondent, stating that the recording of easements and titles "remain critical and require ... immediate attention" and requesting his response by the next Board meeting of February 8, 1989. Again, the respondent did not reply.

By letter of April 10, 1989, Mr. Blair notified the respondent that he had been discharged. On June 15, 1989, Mr. Blair tried again to contact the respondent, requesting his aid in informing the Board of which easements had not been signed and which ones had been signed and recorded in order to facilitate the work of the respondent's replacement, Don Barr. The respondent did not reply, so Mr. Blair, by letter of November 8, 1989, demanded that the respondent furnish the information by December 13, 1989, to either Mr. Blair or Mr. Barr. When the respondent again failed to reply, Mr. Blair filed an ethics complaint with the State Bar on February 19, 1990.

When the respondent failed to answer the letters sent to him by the State Bar on February 28, 1990 and March 22, 1990, seeking a response to the ethics complaint, Bar Counsel caused a subpoena to be issued requiring the respondent to appear at the State Bar Center in Charleston, West Virginia. At his August 29, 1990 appearance, the respondent agreed to return the easements in one week. However, the respondent did not finally deliver the easements to Mr. Barr until November 25, 1990, nearly three months la-

ter, and after repeated inquiries and requests from Mr. Barr.

By letter of December 20, 1991 to the respondent, Mr. Barr made inquiry as to the whereabouts of the 52 missing easements. The respondent did not reply. Mr. Barr thereupon promptly recorded the executed easements and prepared at least 37 easements. Two property owners, who originally had been willing to give the Board the easements free of charge at the beginning of the project, required payment for the easements.

The Committee charges that the respondent's handling of the District's legal matters resulted in violations of Rule 1.3 of the *West Virginia Rules of Professional Conduct* and Disciplinary Rule 6–101(A) of the *West Virginia Code of Professional Responsibility*.[1] Under Rule 1.3 of the *West Virginia Rules of Professional Conduct,* "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Disciplinary Rule 6–101(A)(3) of the *West Virginia Code of Professional Responsibility* provides that a lawyer shall not "[n]eglect a legal matter entrusted to him." This standard has been clarified by case law and more particularly by *ABA Comm. on Ethics and Professional Responsibility,* Informal Op. 1273 (1973), which states:

> Neglect involves indifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client. The concept of ordinary negligence is different. Neglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of an error of judgment made in good faith.

█ We find full, clear and preponderating evidence that the respondent's handling of the Washington Lands Project from 1987 through 1989 constitutes neglect. As "title counsel" for the Project, the respondent's responsibilities, at the very least, included the recordation of easements before con-

struction for the system began. The respondent did not merely fail to record the easements promptly. He did not merely set aside the executed easements and forget about them. Rather, after twenty-two months of unanswered letters from the Board and complaints and a subpoena issued by Bar Counsel, the respondent finally came forward only to admit that the easements had been misplaced. Such a sustained failure to act in a relatively simple matter, even in the face of disciplinary consequences, constitutes violations of Rule 1.3 of the *West Virginia Rules of Professional Conduct* and Disciplinary Rule 6–101(A) of the *West Virginia Code of Professional Responsibility*.

The Committee also found that the respondent failed to communicate properly with the Board, thereby violating Rule 1.4(a) of the *West Virginia Rules of Professional Conduct.* Rule 1.4(a) of the *West Virginia Rules of Professional Conduct* states: "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." The Comment to Rule 1.4 of the *West Virginia Rules of Professional Conduct* states, in part: "The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interest, and the client's overall requirements as to the character of representation."

The evidence in this case fully demonstrates the respondent's failure to comply promptly with the Board's reasonable requests for information regarding the easements. The respondent failed to communicate with the Board, refusing to reply to the repeated and increasingly urgent letters for almost two years.

Absent from the record and brief is a viable explanation of why the respondent failed to respond to Mr. Blair's repeated requests to turn over the easements and why he neglected to tell anyone he could not find them in 1990 and 1991. As justification for this two-year silence, the respondent cites

---

1. On June 30, 1988, this Court adopted the *West Virginia Rules of Professional Conduct* which became effective on January 1, 1989. These rules superseded the *West Virginia Code of Professional Responsibility*. The current counterpart of Disciplinary Rule 6–101(A)(3) is Rule 1.3 of the *West Virginia Rules of Professional Conduct.*

the tremendous pressure he was under between 1986 and 1989—he was going through a divorce and carrying an enormous work load, maintaining a private practice and taking appointed criminal cases through the Public Defender's Office, while also carrying a full docket as an Administrative Law Judge for the Department of Employment Security.

Although the respondent testified that he realized sometime in 1988 that he would no longer have the time to devote his full energies to his representation of the District, the Committee notes that he nevertheless assured Mr. Blair in July, 1988 that he had sufficient time to handle the District's needs. At the very least, the respondent could have found time to have placed a call to the Board and explained his dilemma. Inasmuch as the respondent did not, we find that his behavior constitutes a failure to communicate.

The Committee also found that the respondent violated Rule 8.1(b) of the *West Virginia Rules of Professional Conduct* in repeatedly failing to respond to requests for information pursuant to the ethics complaints filed against him. These requests were made through the mail by the Committee's Bar Counsel on February 28, 1990, and March 22, 1990. Rule 8.1(b) of the *West Virginia Rules of Professional Conduct* states, in part: "[A] lawyer ... in connection with a disciplinary matter, shall not: (b) ... knowingly fail to respond to a lawful demand for information from ... [a] disciplinary authority[.]" Although admitting that he failed to reply to Bar Counsel's two letters of inquiry, the respondent argues that he responded promptly once the Committee's counsel served him with a subpoena.

■ In syllabus point 1 of *Committee on Legal Ethics v. Martin,* 187 W.Va. 340, 419 S.E.2d 4 (1992), we stated:

> An attorney violates West Virginia Rule of Professional Conduct 8.1(b) by failing to respond to requests of the West Virginia State Bar concerning allegations in a disciplinary complaint. Such a violation is not contingent upon the issuance of a subpoena for the attorney, but can result from the mere failure to respond to a request for information by the Bar in connection with an investigation of an ethics complaint.

Accordingly, we find that the respondent violated Rule 8.1(b) of the *West Virginia Rules of Professional Conduct* when he failed to respond to the Committee's counsel's requests for information.

II

## THE DRESCHER CASE

■ On May 20, 1987, the respondent was appointed to represent Thomas Drescher in an appeal of a 1986 conviction for the murder of a Hare Krishna member. This Court refused the petition for appeal on January 14, 1988. At approximately the same time, the respondent was also appointed to represent Mr. Drescher in an unrelated eight-count indictment in federal court. The trial court acquitted Mr. Drescher on all counts except an arson charge. The respondent represented Mr. Drescher on appeal, and the arson conviction was affirmed by the Fourth Circuit Court of Appeals.

The Moundsville Public Defender's office handled Mr. Drescher's trial defense, and the complete case file was kept and maintained there. When the respondent was appointed to represent Mr. Drescher on appeal, the Public Defender's office provided a copy of the file to the respondent upon his request.

Mr. Drescher subsequently was extradited to California to be tried for first-degree murder with "special circumstances" for the killing of another Hare Krishna member in Los Angeles. Under California law, a defendant must be found guilty of first-degree murder in a separate crime in order for a "special circumstance" to attach and make the defendant subject to the death penalty. Mr. Drescher's 1986 murder conviction in West Virginia was the "special circumstance" that could increase the penalty to death. Madelynn Kopple was appointed to represent Mr. Drescher in California.

Ms. Kopple sought to get as much information as possible in order to attack collaterally the West Virginia murder conviction on the grounds that it was constitutionally invalid in an effort to preclude such a "special circumstance" conviction of Mr. Drescher. For this

purpose Ms. Kopple tried unsuccessfully to contact the respondent in the spring of 1989.

Ms. Kopple conducted an investigation in West Virginia in the early summer of 1989. She obtained materials from Michael Frasher, director of the Public Defender Services, who had served as co-counsel in the trial defense of Mr. Drescher. Since several documents relating to the case had been lost in the case transfer to California, Ms. Kopple wrote to the respondent in July, 1989, requesting information about both the arson and murder cases, as well as copies of various pleadings and other information. Ms. Kopple offered to pay for any copying costs and to pay the respondent for his time to discuss the case with her.

When the respondent did not reply to Ms. Kopple's letter, she wrote him again in August, 1989, again receiving no reply. She then sent a certified letter dated October 5, 1989, to the respondent. The respondent replied on October 23, 1989, informing Ms. Kopple that his hourly rate was $85.00 and his standard billing for copying expenses was $.40 per page. The respondent requested a $500.00 deposit before he would begin the five to ten hours of research he thought would be necessary to perform the tasks requested.

Ms. Kopple considered the respondent's rates to be exorbitant so she wrote the respondent a letter dated November 6, 1989, formally demanding Mr. Drescher's file in both the murder appeal and the federal arson case. She enclosed Mr. Drescher's written authorization for release of the file and a check in the amount of $25.00 to cover the costs of mailing the file to her. The respondent did not reply to the letter or send the file. Ms. Kopple again wrote the respondent on December 13, 1989, and August 15, 1990. The respondent again failed to respond.

On September 11, 1990, Ms. Kopple sent a letter to this Court, requesting assistance in obtaining all files and materials in the respondent's possession pertaining to Mr.

Drescher's murder conviction and federal arson conviction. Ms. Kopple also sent a copy of the letter to the West Virginia State Bar. Bar counsel informed the respondent, on October 16, 1990, that an ethics complaint had been opened regarding his refusal to provide Ms. Kopple with copies of Mr. Drescher's file and requested a response. The respondent did not reply.

It is the Committee's contention that the respondent's failure to relinquish the file violates Rule 1.16(d) of the *West Virginia Rules of Professional Conduct.* Rule 1.16(d) requires a lawyer to relinquish a client's file to the client when the attorney-client relationship is ended.[2]

The record reflects that Ms. Kopple repeatedly requested the respondent to furnish her with the Drescher file. She also requested the aid of the Committee which sent correspondence and notice of an ethics charge to the respondent. The record is unclear as to whether the respondent ever relinquished the contents of the Drescher file.

The respondent could not offer any solid excuses for his blatant inaction. The respondent stated that (1) he assumed Ms. Kopple had obtained everything she needed from the Public Defender's office, even though Ms. Kopple repeatedly requested information following her trip to West Virginia; (2) he believed he had no additional material other than what was contained in the Public Defender's file, even though he did not confirm this with Ms. Kopple; (3) he assumed that Mr. Frasher had all the relevant documents and that Mr. Frasher was lying when he said they had been lost.

We do not believe that these explanations override the seriousness of the respondent's failure to relinquish the Drescher file. We believe the respondent should also be sanctioned for this violation.

2. Rule 1.16(d) of the *West Virginia Rules of Professional Conduct* provides, in pertinent part: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest, such as … surrendering papers and property to which the client is entitled[.]" *See also Committee on Legal Ethics v. Cometti,* 189 W.Va. 262, 430 S.E.2d 320 (1993).

## III

## THE SCOTT CASE

On September 26, 1986, Samuel Scott was shot to death as he entered his home in Triadelphia, West Virginia. When an investigation into the murder failed to provide anything conclusive, the Prosecuting Attorney of Ohio County, Patricia Kutsch, and her chief assistant, John Gompers, determined that the evidence was insufficient to try the two suspects in the murder, namely, Samuel Scott's wife, Sharon Scott, and his stepdaughter, Tracy Dumas, who were both inside the house at the time of the shooting.

Richard L. Scott, the murder victim's brother, disagreed with the assessment of the evidence and sought to have the suspects brought to trial. On July 26, 1988, he signed a representation agreement with the respondent to act as a private prosecutor. Pursuant to that agreement, Richard Scott paid the respondent a total of $10,000.00 in 1988 and 1989, and agreed to pay the respondent an additional $5,000.00 on or before the first day of trial.

Even though Ms. Kutsch and Mr. Gompers thought it was premature to take this case before a grand jury, they agreed to allow the respondent to act as a private prosecutor because they were receiving pressure from the Scott family and federal authorities. In the spring of 1989, the respondent testified before the Committee that he was appointed as a special prosecutor by the Honorable George L. Spillers.[3] The respondent then presented the matter to an Ohio County grand jury which returned a true bill.

Subsequently, this Court, in an unrelated matter, ruled that a private prosecutor could not appear before a grand jury. In an order dated May 23, 1989, the Honorable Ronald E. Wilson dismissed the indictment against Mrs. Scott and Ms. Dumas. In that order Judge Wilson referred to the respondent as a private prosecutor. Ms. Kutsch agreed to present the Scott matter to another grand jury upon the condition that the respondent would handle everything except the routine and preliminary matters. On September 12, 1989, Mr. Gompers presented the case to another grand jury which returned true bills against Mrs. Scott and Ms. Dumas.

Mrs. Scott filed eleven motions, including a motion to suppress and a motion to dismiss, on September 26, 1989. Ms. Dumas filed an "Omnibus Discovery Motion" which included four motions to dismiss and two motions to suppress, on September 28, 1993. Mr. Gompers called the respondent to notify him that he needed to answer the motions promptly. When the respondent failed to return Mr. Gompers' call, Mr. Gompers and Ms. Kutsch prepared responses to the motions and filed them on October 11, 1989. Since the motions were scheduled for hearing on October 20, 1989, Mr. Gompers and Ms. Kutsch tried repeatedly to contact the respondent. They were unsuccessful in those attempts.

The respondent testified that in anticipation of filing his response on the day of the hearing and arguing the motions, he went to the Circuit Court of Ohio County on October 17, 1989, to review the motions and returned two days later to prepare his response to the suppression and dismissal motions and to file his motion for appointment of a special prosecuting attorney. He did not notify Ms. Kutsch or Mr. Gompers at any time that he was working on the case.

On October 18, 1989, Ms. Kutsch and Mr. Gompers decided to seek a dismissal of both indictments, asserting that the respondent had failed to contact them and take the lead in the case. The Scotts were not informed of the dismissal of the indictments; instead, they heard about it on the local news. Furthermore, the respondent's secretary cancelled three different appointments the Scotts had made to meet with him. The respondent never contacted his clients again.

In this matter, the Committee charges that the respondent failed to act with the diligence reasonably required under the circumstances in violation of Rule 1.3 of the *West Virginia Rules of Professional Conduct.* As previously stated, Rule 1.3 of the *West Virginia Rules of Professional Conduct* requires a lawyer to "act with reasonable diligence and promptness in representing a client."

---

3. The order appointing the respondent special prosecutor does not appear in the record.

We agree with the Committee's charge. To contend that the respondent ignored the prosecutions only for a short time misses the point. Even though the lapse of time in this case, September 12, 1989, through October 20, 1989, is short compared to the other two disciplinary matters, criminal prosecutions normally proceed in a faster manner than civil cases. When the respondent agreed to act as a private prosecutor, he assumed the responsibility of acting promptly.

The respondent, instead, was inattentive until the hearing date drew perilously near. While Mr. Gompers and Ms. Kutsch understood that the respondent would reply to all pretrial motions, the respondent assumed that Mr. Gompers and Ms. Kutsch would reply to all motions except the motions to dismiss and to suppress. We do not assign blame for this misunderstanding. Mr. Gompers and Ms. Kutsch tried repeatedly and unsuccessfully to contact the respondent in an effort to clarify their respective duties in the prosecution. Not only did the respondent not reply to their calls, he did not even let his co-prosecutors know that he was working on responses.

It is impossible for us to determine if the prosecution would have gone forward if the respondent had acted in a timely manner. However, the respondent's failure to communicate with Mr. Gompers and Ms. Kutsch caused all parties needless frustration. The manner in which the respondent refused to talk with family members, i.e., cancelling three appointments, further demonstrates the respondent's indifferent attitude in the matter.

We therefore find that the respondent violated Rule 1.3 of the *West Virginia Rules of Professional Conduct* when he failed to act diligently and promptly with respect to the Scott case.

## IV

This case presents an issue never addressed by this Court. The question before us is whether a lawyer may be disciplined, for misconduct that occurred while he was practicing law, even though he is no longer engaged in the active practice of law as he is now sitting as a circuit court judge. We are of the opinion, for the reasons set forth below, that a lawyer is not immunized from discipline for violating the *West Virginia Rules of Professional Conduct* based upon the mere fact that he has assumed a judicial office. *See In re Witt,* 145 Ill.2d 380, 164 Ill.Dec. 610, 583 N.E.2d 526, 533 (1991).

Our research reveals that very few courts in the country have clearly addressed this issue, and none in any depth. Thus, we begin with an examination of the important provisions of the rules that govern the members of the West Virginia State Bar. Article III of the *Constitution of the West Virginia State Bar* declares that membership in the State Bar shall consist of "all persons lawfully admitted to the practice of law in the State of West Virginia [and] [n]o person shall practice law in the State of West Virginia unless he is an active member in good standing of the West Virginia State Bar."

Active membership is defined in article II, section 3 of the *By-Laws of the West Virginia State Bar* as:

> An active member in good standing shall be a person lawfully admitted to the practice of the law in the State of West Virginia, who is lawfully engaged in the practice of the law in this State, who is enrolled as an active member, who is not under suspension, and who each year shall duly pay the annual active membership fee to the state bar.

However, a lawyer can still be a member of the State Bar without being an active member. Article II, section 4 of the *By-Laws of the West Virginia State Bar* outlines the prerequisites for lawyers who desire to or must attain inactive membership status:

> Any member of the state bar *not under suspension,* who does not desire to engage in the practice of law in this State, may, upon written request to the secretary, be enrolled as an inactive member, so long as such member shall each year duly pay the annual inactive membership fee to the state bar. *Every judge of a court of record of this State shall be enrolled as an inactive member during his continuance in such office*[.]

(emphasis added). As stated, if a lawyer serves as a judge, he must attain inactive membership status.

As the constitution and by-laws serve as the general governing provisions for the legal profession, the professional responsibilities expected of lawyers and judges are prescribed in two sets of rules, the *West Virginia Rules of Professional Conduct* and the *West Virginia Code of Judicial Conduct*, respectively. *See* n. 1, *supra*. These rules are not all encompassing in that it would be virtually impossible to exhaust every ethical and moral consideration that an officer of the legal system must adhere to; rather, these rules, the *West Virginia Rules of Professional Conduct* and the *West Virginia Code of Judicial Conduct*, are intended to establish ethical standards and serve as a framework for lawyers and judges to follow. Thus, all members of the legal profession are accountable to the public.

■ As this Court is the highest judicial body in the State, it possesses the power to define, supervise, regulate and control the practice of law in West Virginia. This power exists inherently and by express recognition in our Constitution. We acknowledged the inherent authority courts possess with respect to the practice of law in syllabus point 10 of *West Virginia State Bar v. Earley*, 144 W.Va. 504, 109 S.E.2d 420 (1959) where we held, "[i]n the exercise of their inherent power the courts may supervise, regulate and control the practice of law by duly authorized attorneys and prevent the unauthorized practice of law by any person, agency or corporation." The express authority granted to this Court by constitutional mandate was initially recognized in syllabus point 1 of *Lane v. West Virginia State Board of Law Examiners*, 170 W.Va. 583, 295 S.E.2d 670 (1982): "Article eight, section one *et seq.* of the West Virginia Constitution vests in the Supreme Court of Appeals the authority to define, regulate and control the practice of law in

West Virginia." *See* syl. pt. 1 of *State ex rel. Askin v. Dostert*, 170 W.Va. 562, 295 S.E.2d 271 (1982) ("The exclusive authority to define, regulate and control the practice of law in West Virginia is vested in the Supreme Court of Appeals."); *see also State ex rel. Partain v. Oakley*, 159 W.Va. 805, 815, 227 S.E.2d 314, 320 (1976).

■ In accord, it is further within this Court's inherent and express power to impose discipline upon judges as provided in article VIII, section 8 of the *West Virginia Constitution* which declares, in part:

> Under its inherent rule-making power, which is hereby declared, the supreme court of appeals shall, from time to time, prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof, and the supreme court of appeals is authorized to censure or temporarily suspend any justice, judge or magistrate having the judicial power of the State[.]

Thus, pursuant to article VIII, section 8 of the *West Virginia Constitution*, this Court has the inherent and express authority to "prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof[.]" *See also In re DeSaulnier*, 360 Mass. 757, 274 N.E.2d 454, 456 (1971); *Cincinnati Bar Association v. Heitzler*, 32 Ohio St.2d 214, 291 N.E.2d 477, 483 (1972), *cert. denied, Heitzler v. Cincinnati Bar Association*, 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973); *In re Piper*, 271 Or. 726, 534 P.2d 159, 165 (1975); *The Florida Bar v. McCain*, 330 So.2d 712, 714 (Fla.1976).[4]

---

4. Article VIII, section 7 of the *West Virginia Constitution* sets forth the qualifications required of a judge and thus states in pertinent part: "[N]o person may hereafter be elected as a judge of a circuit court unless he has been admitted to practice law for at least five years prior to his election." The importance of this constitutional requirement was recognized in syllabus point 3

of *State ex rel. Haught v. Donnahoe*, 174 W.Va. 27, 321 S.E.2d 677 (1984):

> The requirement contained in West Virginia Constitution art. VIII, § 7, that candidates for the office of circuit judge must have been admitted to the practice of law in the State for five years prior to their election advances the

Our focus herein is on the respondent in his capacity as a lawyer and not as a judge. A judge does not cease to be a lawyer when he or she is elected to office; a judge is a lawyer whose duties are performed behind the bench rather than in front of or before the bench. *See Piper,* 534 P.2d at 166 and *McCain,* 330 So.2d at 715.

It is important for us to emphasize that a judge is first and foremost a lawyer. While acting as a lawyer, he or she is charged with the knowledge of the standards of conduct defined in the *West Virginia Rules of Professional Conduct.* While acting as a judge, he or she is charged with the knowledge of the standards of conduct in the *West Virginia Code of Judicial Conduct.* Any behavior that reveals the lack of integrity and character expected of lawyers and judges within these standards of conduct warrants discipline. The *West Virginia Rules of Professional Conduct* and the *West Virginia Code of Judicial Conduct* serve as a unified system of discipline within the legal profession to achieve a common goal and that is to uphold high standards of conduct to secure and enhance the public's trust and confidence in the entire judicial system.

Our attention here, however, is not centered upon the standards set forth in the *West Virginia Code of Judicial Conduct,* rather, it is centered upon the *West Virginia Rules of Professional Conduct.* When a lawyer, before becoming a judge, violates a rule within the *West Virginia Rules of Professional Conduct,* that violation and ramifications of such violation are in conflict with the ethical standards required of a lawyer who subsequently assumes judicial office. Therefore, pursuant to article VIII, section 8 of the *West Virginia Constitution,* this Court has the inherent and express authority to establish standards of conduct for lawyers who become judges and impose sanctions and penalties for any violation of such standards of conduct.

We find it helpful to incorporate within our analysis a review of how other state courts have decided cases with similar issues. In

State's compelling interest in securing and maintaining a judiciary well qualified in the

the case of *In re Mills,* 539 S.W.2d 447 (Mo.1976), the Missouri Supreme Court was faced with similar circumstances. The respondent in the disciplinary proceeding before the court was accused of misconduct as a lawyer before he became a judge. The respondent argued that since he could not practice law as a judge, he could not be disciplined while a judge for his acts committed when he was a lawyer. The court held that:

> Although he may not practice law while a judge, he still holds a license to practice law (a qualification he must have to hold the office of judge), he is still a lawyer, and if he has violated the Code of Professional Responsibility he is, as an officer of this court, amenable to discipline. . . . He may not take refuge in a judicial office from discipline for prior misconduct. . . . To permit the use of a judicial office as such a sanctuary would be a travesty upon justice.

*Id.* 539 S.W.2d at 449–50. The respondent's license was subsequently suspended indefinitely.

The Supreme Court of Michigan, in the case of *In Re Ryman,* 394 Mich. 637, 232 N.W.2d 178 (1975), reviewed the wrongful acts committed by the respondent prior to his assuming the bench along with wrongful acts committed by the respondent while on the bench. The majority held that the respondent should be removed from his office as judge for such acts of misconduct. In the dissenting opinion, the justice therein concurred with the majority that discipline was warranted, but in lieu of removal, the justice recommended that the respondent should have been suspended without pay. The dissenting justice stated that "[m]isconduct, although unrelated to the performance of judicial duties, and even if occurring before the lawyer becomes a judge, may be 'conduct that is clearly prejudicial to the administration of justice[.]'" *Id.* 232 N.W.2d at 180 (Levin, J., dissenting, in part, and concurring, in part) (citations omitted). The justice further reasoned that:

law of the jurisdiction.

Such misconduct by a person who is or becomes a judge may engender disrespect for the entire judiciary. It matters not that the complained of conduct occurred before assumption of judicial office or was otherwise unrelated to the performance of judicial duties. When a person known to have engaged in unprofessional conduct is allowed without reproach to exercise his judicial function, the integrity of the entire judiciary is put in question and its ability to perform impaired.

*Id.* 232 N.W.2d at 184 (Levin, J., dissenting, in part, and concurring, in part). *See McCain*, 330 So.2d at 714 (" 'The relation of courts and attorneys to the people is one of high responsibility, involving complete trust and confidence and absolute fidelity to integrity. We know of no sound reason why the courts must allow lawyers, solely because of their position or business, including judges of the courts, to retain their licenses despite their conduct which would disbar other lawyers.' " (citation omitted))

Finally, in *Matter of Benoit*, 487 A.2d 1158 (Me.1985), the Supreme Judicial Court of Maine disciplined a judge for acts committed while serving as judge. The court therein eloquently stated, and we think it is worth noting, the necessity and purpose for imposing sanctions for misconduct occurring within the legal profession:

'Any sanction must be designed to preserve the integrity and independence of the judiciary and to restore and reaffirm the public confidence in the administration of justice. Any sanction must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future. Thus, we discipline a judge to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that the judicial misconduct is neither permitted [nor] condoned. We discipline a judge to reassure the public that the judiciary of this state is dedicated to the principle that

ours is a government of laws and not of men.'

*Id.* at 1174, (*quoting Matter of Ross*, 428 A.2d 858, 868–69 (1981)).

The underlying premise inferred in these cases is the rule in our state: A lawyer must possess good moral character and be a member in good standing within the State to be eligible to practice law. *See* art. III of the *Constitution of the West Virginia State Bar* and Rule 4.2 of the *West Virginia Rules for Admission to the Practice of Law.*

The imminent question arises as to whether the respondent can be disciplined for his misdeeds as a lawyer in violation of the *West Virginia Rules of Professional Conduct.* The Committee recommends that the respondent's license to practice law be suspended for six months with automatic reinstatement. Would it be appropriate for the respondent to hold judicial office if the respondent's law license was suspended or annulled prior to being elected judge, and such suspension or annulment was in effect when he was to assume his office as judge? No reasonable court would conclude that it would be appropriate. Certainly a judge must adhere to the same or higher standards than those of a lawyer. *See* canons 1 and 2 of the *West Virginia Code of Judicial Conduct; see also Heitzler*, 291 N.E.2d at 482.

If a lawyer is suspended he or she cannot seek inactive membership status within the State Bar. *See* article II, section 4 of the *By–Laws of the West Virginia State Bar.* Every judge in this State is an inactive member of the State Bar. *Id.* It would defy common sense to allow a lawyer who became a judge to become an inactive member of the State Bar if his or her license to practice law is suspended inasmuch as a lawyer cannot attain inactive membership status when his or her license to practice law is suspended. It stands to reason that quite clearly a lawyer cannot be a judge if he or she is unable to attain inactive status.

■ Pursuant to article II, section 4 of the *By–Laws of the West Virginia State Bar*, a lawyer whose license to practice law has been suspended shall not be enrolled as an inactive member of the State Bar while such license

is suspended. A judge of a court of record in this State shall not be enrolled as an inactive member of the State Bar if his or her license to practice law has been suspended. Because a judge of a court of record must attain inactive status through enrollment and without suspension, a lawyer, whose license to practice law has been suspended, does not satisfy the fundamental standards of conduct required of a lawyer to assume or hold judicial office as prescribed by this Court pursuant to article VIII, section 8 of the *West Virginia Constitution.* Thus, regardless of the fact that the respondent is no longer engaged in the active practice of law since he has assumed his position as judge, he does not meet the fundamental requirement of becoming an inactive member of the State Bar in that his license to practice law has been suspended. *See* n. 1, *supra.*

It is clearly a duty of this Court to require any member of the State's judiciary to adhere to the same or higher standards of conduct as would be expected of any member of the State Bar. But more importantly, our constitutional mandates and principles governing this profession are ultimately designed to protect and ensure that the public is protected from being counseled, advised or represented by unqualified and undisciplined lawyers in relation to legal matters. The public must also be protected from a judge whose acts while serving as a lawyer resulted in disciplinary proceedings. *See generally State ex rel. H.K. Porter Co. v. White,* 182 W.Va. 97, 386 S.E.2d 25 (1989).

Our State's Constitution is unique in relation to many other states in that article VIII, section 8 is quite broad. It gives this Court the authority to ensure that appropriate standards of conduct are adhered to by lawyers who serve as judges. In order to preserve the fidelity and integrity of the judiciary and ultimately protect society, we are compelled to impose discipline upon the respondent. The gravity of allowing the deterioration of the standards of conduct expected of lawyers and judges alike as mandated by our State's Constitution demands that this Court perpetuate justice.

▇▇▇▇▇ Upon examination of the record and careful consideration of the arguments of counsel, and the principles, conclusions and comments of the existing case law, we conclude that the allegations of professional misconduct are substantiated by the evidence and imposition of discipline is warranted. It is well established that this Court is the final arbiter of disciplinary proceedings when the ethical conduct of a lawyer is in question:

' "This Court is the final arbiter of legal ethic problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Committee on Legal Ethics v. Blair,* [174] W.Va. [494], 327 S.E.2d 671 (1984).' Syl. pt. 1, *Committee on Legal Ethics v. Charonis,* 184 W.Va. 268, 400 S.E.2d 276 (1990).

Syl. pt. 1, *Committee on Legal Ethics v. Ikner,* 190 W.Va. 433, 438 S.E.2d 613 (1993). The due process concerns associated with this type of proceeding are as follows:

Under the authority of the Supreme Court of Appeal's inherent power to supervise, regulate and control the practice of law in this State, the Supreme Court of Appeals may suspend the license of a lawyer or may order such other actions as it deems appropriate, after providing the lawyer with notice and an opportunity to be heard, when there is evidence that a lawyer (1) has committed a violation of the Rules of Professional Conduct or is under a disability and (2) poses a substantial threat of irreparable harm to the public until the underlying disciplinary proceeding has been resolved.

*Id.* at syl. pt. 2. We find that the respondent was afforded every due process consideration required of such proceeding.

▇▇▇▇ It is evident from the record in this case that the respondent has violated numerous ethical standards of his profession. The violation of these ethical standards undermines the spirit of the obligations in which he vowed to uphold. The fact that the respondent is no longer engaged in the active practice of law as a result of his assuming judicial office has no effect on this Court's imposition of discipline. The respondent may not serve as a circuit court judge at this time in that the respondent is unable to fulfill the judicial

requirement of becoming an inactive member of the State Bar.

The Committee recommends that the respondent's license to practice law be suspended for six months with automatic reinstatement. Upon all the above, we agree with the recommendation of the Committee insofar as we believe the respondent should be disciplined for his acts of misconduct in violation of the *West Virginia Rules of Professional Conduct.* We have considered, however, the extent to which the respondent should be disciplined and conclude that a three-month suspension of the respondent's law license, with automatic reinstatement, would be appropriate based upon the circumstances of this case. Therefore, the respondent shall be suspended from his judicial duties for a three-month period without pay and all costs of the proceedings shall be assessed against the respondent.

Three–Month Suspension, Plus Costs.

NEELY, Justice, dissenting:

Under *W.Va.Const.*, Art. VIII, § 7, it is not necessary for a judge to be a licensed lawyer during his tenure as a judge.[1] It is sufficient that a person who becomes a judge have been "admitted to the practice of law for at least five years prior to his election." Removal of a judge from office may be accomplished only by the legislature through impeachment and suspension of a judge during his term can be effected only by this

Court through the mechanism for judicial discipline mandated by *W.Va.Const.*, Art. VIII, § 8.[2]

Although decisions of other courts, construing their own constitutions are, for obvious reasons, not binding on us, other state courts have reached the same conclusion that I do. The Supreme Court of Louisiana in *In re Jones*, 202 La. 729, 12 So.2d 795, 797 (1943) stated:

> "The methods that are prescribed in the constitution for ridding the people of unworthy officials, whether by impeachment, address out of office by members of the legislature, or by removal from office by the courts, are exclusive, as are also the penalties that are levied in each instance ... It therefore follows that to permit the disbarment of a district judge during his tenure of office, when one of the constitutional requirements for his holding such office is that he must be an attorney at law, would be to sanction the doing indirectly of that which cannot be done directly, that is, his removal from office by reason of disqualification."

1. Indeed, Section 7 of Article VIII of our *Constitution* is carefully worded so that a person need only have been "admitted to practice law for at least five years prior to his election," thereby allowing law professors and others not actively engaged in a law practice to be eligible to sit as judges.

2. *W.Va. Const.*, Art. VIII, § 8 provides in pertinent part: "A justice or judge may be removed only by impeachment in accordance with the provisions of section nine, article four of this Constitution ... no justice, judge or magistrate shall be censured, temporarily suspended or retired ... unless he shall have been afforded the right to have a hearing before the supreme court of appeals ..."