IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2025 Term

No. 24-436

FILED

October 24, 2025

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

In the Matter Of:


THE HONORABLE ELIZABETH BOSO, Magistrate of Nicholas County and
Former Magistrate Candidate of Kanawha County,

---

DISCIPLINARY PROCEEDING

SUSPENDED
AND OTHER SANCTIONS

---

Submitted: September 16, 2025
Filed: October 24, 2025


Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for the West Virginia
Judicial Investigation Commission

Honorable Elizabeth Boso
Summersville, West Virginia
Self-Represented


JUSTICE BUNN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings.'" Syllabus Point 1, *W. Va. Jud. Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 271 S.E.2d 427 (1980).

2.      "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syllabus, *In re Gorby*, 176 W. Va. 16, 339 S.E.2d 702 (1985).

3.      In judicial disciplinary matters, the Court is not bound by admissions or stipulations to facts or violations of the West Virginia Code of Judicial Conduct and may employ its independent, de novo review to determine whether such stipulations are both legally and factually supported.

4.      "Under Rule 4.12 of the *Rules of Judicial Disciplinary Procedure* [1998] the Judicial Hearing Board may recommend, or this Court may impose, one or more of the following sanctions for each violation by a justice, judge, or magistrate of the *Code of Judicial Conduct*: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement in limited circumstances. Additionally, this Court can assess the cost of the disciplinary proceedings

i

against a justice, judge, or magistrate." Syllabus Point 6, *In re Watkins*, 233 W. Va. 170, 757 S.E.2d 594 (2013).

5. "Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syllabus Point 3, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

**BUNN, Justice:**

The Judicial Investigation Commission ("JIC") charged respondent Elizabeth Boso, Magistrate of Nicholas County ("respondent"), with falsely claiming that she resided in Kanawha County for purposes of obtaining appointment to a magistrate vacancy there. In the proceedings below, respondent admitted to all the facts and rule violations alleged in the Statement of Charges and reached an agreement with Judicial Disciplinary Counsel ("JDC") as to the appropriate discipline. The West Virginia Judicial Hearing Board ("Board") accepted respondent's admissions and recommends respondent be suspended without pay for two months, censured, and required to pay costs for six violations of the West Virginia Code of Judicial Conduct. This Court placed the Board's recommendation on the argument docket for further consideration.

Based on our de novo review, we find that five of the six violations alleged in the Statement of Charges were based on rules not applicable to respondent at the time of the underlying conduct as she was neither a "judge" nor a judicial candidate "subject to public election." We agree that respondent violated Rule 4.1(A)(9) of the West Virginia Code of Judicial Conduct and conclude that the Board's recommended discipline of suspension without pay for two months, censure, and payment of costs, remains appropriate for the misconduct resulting in that violation.

1

## FACTS AND PROCEDURAL HISTORY

Respondent is currently an elected magistrate in Nicholas County, West Virginia, winning that seat in 2024 shortly after the events underlying this proceeding. Prior to her election, she was a longtime magistrate assistant in both the Nicholas and Kanawha County magistrate court systems. She began her employment as a magistrate assistant in Nicholas County in November 2005. That same year she established a residential address in Summersville, Nicholas County, where she lived with her husband.

In 2019, respondent accepted employment as a magistrate assistant in Kanawha County, West Virginia, but continued to reside in Summersville, commuting to her workplace in Charleston, Kanawha County. In 2021, she bought a condominium in Charleston to minimize hotel stays during weekend court or inclement weather but maintained the Summersville residence where her husband continued to reside. In March 2023, respondent left the magistrate assistant position in Kanawha County to return to work in Nicholas County as an assistant to then-Magistrate Sarah Brown. She sold her Charleston condominium on June 9, 2023.

Later that year, in November 2023, respondent sent two text inquiries to Kanawha County Magistrate Court personnel about renting from them because she "need[ed] an address in Kanawha County[]" for purposes of her anticipated candidacy for

an open Kanawha County magistrate seat.[1] The appendix record contains text exchanges confirming these discussions. One of those inquiries was to a Kanawha County magistrate assistant who had a rental property in Clendenin, West Virginia; respondent testified she declined that rental because a one-year lease was requested.

The second inquiry was to Kristie Trabert, magistrate assistant to then-Kanawha County Magistrate Mike Ferrell. Ms. Trabert owned and lived alone in a home in Dunbar in Kanawha County, West Virginia. On November 16, 2023, respondent texted Ms. Trabert, stating that she wanted "to see if I could rent a room from you for an address until the election is over" and that she preferred to "keep it way on the down low."[2] Respondent stated she would pay "[$]150 a month to use your address for my purpose." Ms. Trabert responded, "that would be totally fine with me[.]" In early January 2024, respondent texted Ms. Trabert to inquire whether she was "still ok" with being "roommate[s] for a while"; respondent stated that she needed to get her "paperwork in[,]" and asked "[w]hat is our address?" On January 11, 2024, respondent texted Ms. Trabert that she would be in Charleston and would "leave your check" on Ms. Trabert's desk. No written lease agreement was prepared.

---

[1] The Legislature created three additional magistrate seats in Kanawha County in 2023.

[2] Respondent contended that she meant that she wanted to keep her job in Nicholas County and did not want news of her intentions to run in Kanawha County to spread there.

3

On January 19, 2024, Magistrate Ferrell resigned and Ms. Trabert texted respondent that day to advise of this development. The two discussed the necessary vacancy appointment and respondent indicated that she believed a senior status magistrate would be appointed because the election was so close. The next day, however, Ms. Trabert texted respondent encouraging her to apply for the vacancy; on January 22, 2024, respondent texted Ms. Trabert stating, "I'm applying for [Magistrate Ferrell's] position. . . . I'm using our address."

That same day, respondent emailed Kanawha County Circuit Judge Maryclaire Akers—who was serving as Chief Judge of the circuit and responsible for making the magistrate vacancy appointment—asking that she be considered for appointment to Magistrate Ferrell's vacancy. Outlining her work history as a magistrate assistant, respondent's email stated: "I had moved to Kanawha County in 2021 and, after transferring to Nicholas, I have maintained a residence in Kanawha due to wanting to run in the upcoming election for one of the new Magistrate seats." On January 23, 2024, respondent filed an application for appointment to Magistrate Ferrell's vacancy using Ms. Trabert's Dunbar address as her "home address"; under the application's blank for "home county" respondent wrote "Working in Nicholas." The application was not sworn but included an attestation that "the answers given herein are true and complete to the best of my knowledge." An accompanying resume included only the Dunbar address.

4

On January 26, 2024, Judge Akers appointed Earl Whittington to the vacancy. Ms. Trabert texted respondent to advise of this development stating that the "only thing I think she [Judge Akers] could have tried to make an issue was your renting from me[.]" That same day, respondent filed candidacy papers in Nicholas County for the magistrate position held by then-Magistrate Brown and listed her "legal residence" as her longtime address in Summersville, West Virginia.

On January 29, 2024, Judge Akers emailed JDC stating that respondent "used" Ms. Trabert's address to apply for the vacancy, and JDC opened a disciplinary complaint on January 31, 2024. Shortly after respondent received the complaint, she texted Ms. Trabert, indicating that the complaint "allude[d] to the notion that I was somehow aware of Ferrell quitting and trying to use your address to get the appointment[]" but that "when I paid my January rent to you we had absolutely no clue about Ferrell." Respondent's text to Ms. Trabert also stated that she had been "actively looking for an apartment for several months to move back down there" and that she had all of her "emails to apartment places[.]"

On February 12, 2024, respondent responded to the complaint explaining that she reached an agreement to rent a room from Ms. Trabert in 2023 "because I had every intention of running for Magistrate in Kanawha County[.]" She further stated that "by the time I realized I wanted to be back in Charleston, the condo was gone[]" and that she "ha[d]

5

been scouting out a new home in Charleston for months now." She explained that she chose to rent "for the time being due to interest rates being so high."

On May 23, 2024, JDC took respondent's sworn statement. Respondent readily admitted that, apart from the time she owned the Charleston condominium, she lived continuously at the Summersville address since 2005. She took the position that due to her rental agreement with Ms. Trabert, she had two residences in January 2024 when she applied for the magistrate vacancy but that her "primary residence was Nicholas County." She admitted that she had never been to Ms. Trabert's home but was adamant she intended to utilize that location for campaigning during the election season. She admitted that her driver's license, voter registration, utilities, and property taxes all reflected a Nicholas County address. She justified the use of the Dunbar address on her application and resume, explaining

> I thought if I had a rental property that, you know, the way I read it was that you have to reside in the county to which you are elected, and that was an appointment. I had applied for [a different] appointment. I had applied for many jobs down here, you know. So that was totally on me, and that was my fault.

Respondent also explained her text message to Ms. Trabert that she was renting the room "for the address":

> In order to file for down here, I felt that I had to have like an address, a mailing address in Kanawha to run. I had been looking at rental property and stuff like that and everything was like crazy . . . . So I was just going to rent it, and I'm not going to lie, I was going to use her address as a rental property as my address in Kanawha County.

6

Respondent further explained her understanding that the magistrate eligibility requirements required her "[t]o have a residence, to have a residential address was my understanding."[3] She testified that she intended to find something "more permanent" if appointed or elected, "but I had to have an address to run. That was my thought process." Respondent stated that she "probably" should have used her Summersville address, but "just put the address that I was going to use if I ran here." Respondent admitted that her email to Judge Akers stating that she had "maintained a residence" in Kanawha County since 2021 was "incorrect. Yes, that was a misstatement."

The JIC filed formal charges against respondent on August 7, 2024, alleging six violations of the Code of Judicial Conduct: Rule 1.1[4] (requiring judges to comply with

---

[3] When asked to admit she was "not eligible to be a magistrate in Kanawha County at the time of the appointment," respondent replied:

> My understanding of the way that it [was] worded, I thought that I could. I clearly misinterpreted, you know, where the canon said that you shall reside in the county in which you are elected. It does not say appointed. I know other people have been appointed that have not resided, technically, in the county that they were appointed to, and that address came later. So I should have checked on it. I did not. That was on me.

*But see infra* n.10.

[4] Rule 1.1 provides: "A judge shall comply with the law, including the West Virginia Code of Judicial Conduct."

7

the law); Rule 1.2[5] (requiring judges to act in a manner that promotes public confidence in judiciary and avoid impropriety); Rule 2.16(A)[6] (requiring judges to be candid with judicial disciplinary agencies); Rule 4.1(A)(9)[7] (prohibiting judicial candidates from knowingly making false or misleading statements); and Rules 4.2(A)(1) and (A)(2)[8] (requiring judicial candidates subject to public election to act in a manner consistent with the integrity of the judiciary and comply with all applicable election laws and regulations).

Respondent and JDC then entered into an agreement in which respondent admitted to the entirety of the allegations contained in the Statement of Charges and the charged rule violations.[9] JDC and respondent further agreed that respondent was

---

[5] Rule 1.2 provides: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

[6] Rule 2.16(A) provides: "A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies."

[7] Rule 4.1(A)(9) provides: "Except as permitted by law, or by Rules 4.2, 4.3, and 4.4, a judge or a judicial candidate shall not[] . . . knowingly, or with reckless disregard for the truth, make any false or misleading statement[.]"

[8] Rule 4.2(A)(1) and (2) provides: "A judge or candidate subject to public election shall: (1) act at all times in a manner consistent with the independence, integrity, and impartiality of the judiciary; [and] (2) comply with all applicable election, election campaign, and election campaign fund-raising laws and regulations of this jurisdiction[.]"

[9] Respondent's factual admissions included: 1) at the time she applied for the vacancy "her residence/domicile was clearly in Nicholas County[]"; 2) she "was not a resident of Kanawha County[]"; and 3) she "was clearly not domiciled in Kanawha County at the time she applied for the Magistrate appointment." She further admitted that her email to Judge Akers about maintaining a residence "was . . . a lie[.]"

8

cooperative during the investigation, admitted her wrongdoing, and that the appropriate discipline was a "public censure," suspension without pay for two months, and payment of costs in the amount of $618.45. On October 25, 2024, the Board held a hearing acknowledging respondent and JDC's agreement, including respondent's admissions to the factual allegations and rule violations contained in the Statement of Charges. The Board permitted respondent to make a statement during which she expressed that she was "immensely sorry[]" and wanted to be an "asset to the Court . . . and not a stain." The Board then unanimously recommended adoption of the parties' agreement, including the agreed discipline, and both JDC and respondent filed their consent to the recommendation.

## II.

### STANDARD OF REVIEW

It is well-established that in judicial disciplinary proceedings, "[t]he Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings." Syl. Pt. 1, *W. Va. Jud. Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 271 S.E.2d 427 (1980); *see also In re Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998) ("The independent evaluation of the Court shall constitute a *de novo* or plenary review of the record."). In this case, respondent and JDC entered into an agreement in which respondent admitted to all the factual allegations and rule violations contained in the Statement of Charges. The Board accepted this agreement wholesale, as well as the parties' agreed discipline, and recommended its adoption to the Court. Although we believe it well understood that this Court is the ultimate arbiter of the

9

particular sanction to be imposed, we take this opportunity to clarify the import of our de novo review in judicial disciplinary matters where the Court is presented with stipulated or admitted facts or rule violations.

"The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl., *In re Gorby*, 176 W. Va. 16, 339 S.E.2d 702 (1985). To effectuate that purpose, we have observed that it is part of our "constitutional duty under Section 8 of Article VIII of the West Virginia Constitution to make a completely independent evaluation of the record." *In re Browning*, 192 W. Va. 231, 233, 452 S.E.2d 34, 36 (1994) (footnote omitted). Although the Board is authorized to conduct hearings and issue findings of fact, conclusions of law, and a recommended decision for our consideration, it is not uncommon for the parties to present negotiated admissions or stipulations to the Board.

With respect to stipulated facts, we have held that those facts "will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, *Starcher*, 202 W. Va. at 56-57, 501 S.E.2d at 773-74. However, nothing in this syllabus point purports to obligate the Court to accept such admissions or stipulations for purposes of our independent evaluation of the underlying conduct or charges. Rather, *Starcher* clarifies only that the *parties* are bound by these stipulations and may not later argue that those facts were not

10

proven to the requisite degree of proof: "[I]t is clear that a party who stipulates facts is bound by those stipulations, . . . and that the facts stipulated are considered to have been proven to the requisite standard of proof[.]" *Id*. at 62, 501 S.E.2d at 779.

And while the Court has not expressly addressed the impact of stipulated facts or rule violations on our de novo review, the Court's constitutional obligation to oversee judicial discipline makes clear that we may not subordinate our review to agreements between the parties. Admissions or stipulations as to facts or rule violations may be prompted by personal or professional objectives or influenced by myriad factors including the presence or absence of counsel, real or perceived risk of additional charges, or simply a desire to appear cooperative or remorseful—factors that weigh heavily in recommended and ultimate sanctions. As the Supreme Court of Utah observed, "stipulations often represent compromises and bargains." *In re Christensen*, 304 P.3d 835, 839 (Utah 2013). As a result, our blind acceptance of those admissions or stipulations may undermine the integrity and consistency of the disciplinary process where they are not well-founded.

As to the Board's factual determinations generally, the Court has recognized that they should be given "substantial weight." *Browning*, 192 W. Va. at 234 n.4, 452 S.E.2d at 37 n.4. Despite this deference, "[t]here is nothing in the constitution or rules that requires us to give any *conclusive* weight to findings or recommendations of the [B]oard[.]" *Dostert*, 165 W. Va. at 236, 271 S.E.2d at 429 (emphasis added). Likewise, there is nothing

11

in the Constitution or our rules that requires us to conclusively accept agreements reached by JDC and involved parties regarding facts or violations committed. *See* Syl. Pt. 1, in part, *In re Baughman*, 182 W. Va. 55, 385 S.E.2d 910 (1989) ("In all cases arising under the *Judicial Code of Ethics*, the Supreme Court of Appeals reserves the prerogative to make an independent factual inquiry[.]").

Other courts agree that stipulations to facts or rule violations do not constrain a court's plenary review of disciplinary proceedings. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Lynch*, 901 N.W.2d 501, 506 (Iowa 2017) ("Although stipulations of fact are binding on the parties, '[a]n attorney's stipulation as to a violation is not binding on us[.]' 'Even if an attorney's stipulation concedes a rule violation, we will only find that a violation occurred if the facts are sufficient to support the stipulated violation.'" (citations omitted) (alterations in original)); *Christensen*, 304 P.3d at 839 ("[B]ecause of our plenary authority over judicial disciplinary matters, and our constitutional duty to impose sanctions that we find to be 'just and proper,' we are not bound to enforce the Stipulation." (citations omitted)); *In re Disciplinary Proc. Against Ziegler*, 750 N.W.2d 710, 716 (Wis. 2008) ("A stipulation does not bind the Judicial Conduct Panel as to either the facts or proposed appropriate discipline." (footnote omitted)); *State ex rel. Oklahoma Bar Ass'n v. McGee*, 48 P.3d 787, 792 (Okla. 2002) ("Although respondent has stipulated to violating Rule 1.2, ORPC, we have a duty to review the evidence *de novo* to determine if the allegations of misconduct are established by clear and convincing evidence. Stipulations of the parties

12

and findings of fact and recommendations of the Tribunal are advisory, being neither binding nor persuasive.").

We therefore now expressly hold that in judicial disciplinary proceedings, the Court is not bound by admissions or stipulations to facts or violations of the West Virginia Code of Judicial Conduct and may employ its independent, de novo review to determine whether such admissions or stipulations are both legally and factually supported.

## III.

## DISCUSSION

We turn now to the charged rule violations and recommended sanctions. We first observe that the Statement of Charges alleges that "[a]t all times relevant to the proceedings set forth below" respondent was "*either* a candidate for *appointment* to the position of Magistrate of Kanawha County, a candidate for *election* to the position of Magistrate of Nicholas County, or the Magistrate-Elect of Nicholas County." (Emphasis added). It then sets forth a narrative of underlying facts and summarily alleges that those facts support the charged rule violations. However, nowhere does the Statement of Charges or JDC's briefing address the applicability of each Rule relative to respondent's variable status at the time of each alleged violation. Because the Code of Judicial Conduct applies only to specified individuals, an examination of respondent's defined status at the time of the underlying conduct is a necessary step in analyzing each alleged violation.

13

### A. The "Judicial Candidate" Violations—Rules 4.1 and 4.2

Rule 4.1 of the Code of Judicial Conduct is entitled "Political and Campaign Activities of Judges and Judicial Candidates *in General*" and Rule 4.2 is entitled "Political and Campaign Activities of Judicial Candidates *in Public Elections*." (Emphasis added). The factual premise of these charges is respondent's alleged lack of qualifying residency and misrepresentation of her residency at the time she sought appointment to the magistrate vacancy in Kanawha County in January 2024.

Although respondent briefly argues that she was merely a "job applicant," we find that she plainly qualified as a "judicial candidate" under our Rules. The "Terminology" section of the Code of Judicial Conduct defines "[j]udicial [c]andidate" as "any *person*, including a sitting judge, who is seeking *selection for* or retention in *judicial office by* election or *appointment*." W. Va. Code of Jud. Conduct, "Terminology" (emphasis added). That definition further provides that a person becomes a "judicial candidate" "as soon as he or she . . . declares or files as a candidate with the election or appointment authority[.]" *Id.* Because respondent sought selection for the magistrate vacancy by appointment, she was a "judicial candidate" as of January 22, 2024, when she declared her intention to seek the vacancy appointment via email to Judge Akers.

Rule 4.1(A)(9) provides that "a judge or a judicial candidate shall not[] . . . knowingly or with reckless disregard for the truth, make any false or misleading statement[.]" Therefore, Rule 4.1(A) was applicable to respondent as a "judicial

candidate," and we agree that the record supports her violation of this Rule. In her application and resume, respondent attempted to create the impression that she was residing in Dunbar, Kanawha County, despite never having even visited the listed address.[10] While respondent may have reached some agreement with Ms. Trabert to utilize her Dunbar address in exchange for "rent" payment—and arguably intended to utilize that location in the future for campaign purposes—at the time of her application in January 2024 she did not live or "reside" in Dunbar under any definition of those terms. Respondent's email to Judge Akers to the same effect was, as admitted in her sworn statement, plainly false: she did not "maintain" a residence in Kanawha County since returning to work in Nicholas County, having sold her condominium in June 2023.[11]

However, in contrast to Rule 4.1's application to judicial candidates generally, Rule 4.2 governs the "[p]olitical and [c]ampaign [a]ctivities" of "[j]udicial [c]andidates *in [p]ublic [e]lections*." (Emphasis added). The charged Rules provide that

---

[10] In support of its Rule 4.2(A)(2) allegations requiring compliance with "election . . . laws and regulations" JDC devotes a portion of its brief to arguing that respondent, as an appointive candidate, was nonetheless required to comply with West Virgina Code § 50-1-4 (requiring a magistrate to "reside in the county of his election[]"), as well as our caselaw regarding candidacy "residence." Because the underlying misconduct was not alleged to have occurred while respondent was a candidate for public election, as discussed *infra*, we need not address the applicability of this statute to candidates for vacancy appointments. Further, respondent's violation of Rule 4.1 implicates only the truthfulness of her representations about residency, rather than the necessity of that residency to be an appointive candidate.

[11] Consistent with her sworn statement, respondent's admission to the entirety of the Statement of Charges includes the specific allegation that "[t]his statement was . . . a lie[.]"

15

"[a] judge or *candidate subject to public election* shall: (1) act at all times in a manner consistent with the independence, integrity, and impartiality of the judiciary; [and] (2) comply with all applicable election, election campaign, and election campaign fund-raising laws and regulations of this jurisdiction[.]" (Emphasis added). While respondent was a "judicial candidate" at the time of her alleged misrepresentations in January 2024, she was not a candidate "subject to public election" for purposes of violating the provisions of Rule 4.2.[12] All of the conduct in the Statement of Charges alleging misrepresentation of her residency occurred while she was a layperson judicial candidate for appointment to a magistrate vacancy. The record contains no allegations that respondent misrepresented her residency after she filed her candidacy papers for election to Nicholas County magistrate.

Recently, the Supreme Court of Florida rejected a judge's stipulation to a violation of the judicial code "because it [was] based in part on a legally incorrect reading of the Code of Judicial Conduct." *In re Flynn*, 397 So. 3d 39, 39 (Fla. 2024). The Judicial Qualifications Commission charged Judge Flynn with violating a canon concerning attendance at "'political party function[s],'" and Judge Flynn stipulated to that violation. *Id*. at 39-40. However, the *Flynn* Court found that the Commission characterized the host of the event as a "'political *organization*'" and erred by interpreting the canon "in a way

---

[12] Rule 4.2's inclusion of the specific reference to judicial candidates "subject to public election" is significant, as evidenced by the distinction made in Rule 4.3 governing "Activities of Candidates for *Appointive* Judicial Office." (Emphasis added). Rule 4.3, however, contains no additional prohibitions applicable to respondent's misrepresentations as those are adequately covered by the broader language of Rule 4.1 governing "judicial candidates."

that ignores the difference between those terms." *Id*. at 40 (emphasis added). The court rejected the stipulation and remanded, reasoning that it could not "overlook a legal error like this just because both parties agreed to it." *Id*. Similarly, because the Statement of Charges in this matter identifies no residency misrepresentations that occurred while respondent was a judicial candidate subject to public election, we find that Rule 4.2 was not applicable to her at the time of the alleged misconduct despite her admission to two violations of the Rule.

### *B. Rule 1.1 and 1.2 Violations*

Rule 1.1 provides that "[a] judge shall comply with the law, including the West Virginia Code of Judicial Conduct." Similarly, Rule 1.2 provides that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Although respondent is currently a judge, she was a "judicial candidate" at the time of the misrepresentations regarding her residency as established above; neither the Statement of Charges nor JDC's briefing addresses the applicability of these Rules to a judicial candidate. At oral argument, JDC urged that these provisions are simply "catch-alls" generally applicable as concurrent violations of the Rules. We reject that indiscriminate reading of the plain language of the Rules.

The terms "judge" and "judicial candidate" are not interchangeable under our Code of Judicial Conduct, nor are the rules that apply those terms. Each term is separately

defined and individually referenced throughout the Code. The "Application" section of the Code purports to "establish[] when the various Rules apply to a judge or judicial candidate." W. Va. Code of Jud. Conduct, "Application." It then provides that "[a]nyone, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions . . . is a judge within the meaning of the Code[,]" including but not limited to Justices of this Court, circuit and family court judges, and magistrates. *Id*. at I.(A), in part. Critically, the next provision states that "[a]ll judges shall comply with this Code except as provided below. All *judicial candidates* for judicial office shall comply with the applicable provisions of this Code." *Id*. at I.(B) (emphasis added).

While a judge may also be a "judicial candidate," being a judicial candidate obviously does not make respondent a "judge" at the time of her misconduct.[13] Respondent was a layperson judicial candidate and did not become a "judge" under the Code until she was sworn into office as Nicholas County magistrate. JDC offers no authority for the

---

[13] To the extent that these violations purport to stem from the alleged Rule 2.16(A) violation, we note that respondent's sworn statement was given on May 23, 2024—after her election to magistrate but before she was sworn into office. We find no authority for the extension of the term "judge" to judges-elect. *See* discussion *supra*. In fact, we have noted that the former Judicial Code of Ethics tethered the obligations of incumbent judges to judicial candidates, rather than judges. *In re Callaghan*, 238 W. Va. 495, 507 n.11, 796 S.E.2d 604, 616 n.11 (2017). ("'[A] candidate, including an incumbent judge, for a judicial office . . . should not . . . misrepresent his identity, qualifications, present position, or other fact.'").

extension of Rules 1.1 and 1.2 to judicial candidates and we find none.[14] We therefore find Rules 1.1 and 1.2 were also inapplicable to respondent at the time of the underlying misconduct despite her admission to those violations.

### C. Rule 2.16(A) Violation

Rule 2.16(A) is the remaining violation asserted in the Statement of Charges and, like Rules 1.1 and 1.2, is applicable to "judge[s]," requiring them to "cooperate and be candid and honest with judicial . . . disciplinary agencies." The Statement of Charges does not specify which of respondent's statements to JIC or JDC were not candid; however, the record reveals only two potential statements: respondent's February 12, 2024, response to the complaint or her May 23, 2024, sworn statement. Neither of these statements was made after respondent was sworn in as magistrate; therefore, she was not a "judge" for

---

[14] As further evidence that judicial candidates who are not also judges are not subject to the Rules applicable to "judges," Rule 4.2(A)(1) contains its own independent requirement that judicial candidates subject to public election must "act at all times in a manner consistent with the independence, integrity, and impartiality of the judiciary[]"— an obligation nearly identical to that contained in Rule 1.2 Were all judicial candidates tantamount to a "judge" for purposes of Rule 1.2, this separate provision of Rule 4.2(A)(1) would be superfluous. *See State ex rel. Johnson v. Robinson*, 162 W. Va. 579, 582, 251 S.E.2d 505, 508 (1979) (rejecting construction of authority that renders other provisions "redundant, superfluous and without meaning[]"). However, as previously discussed, respondent was not a judicial candidate subject to public election and therefore we cannot substitute this Rule in place of the inapplicable Rule 1.2 violation.

We note further that in the most recent reported judicial disciplinary case involving a non-judge's conduct during judicial candidacy—unlike the instant case—the inapplicability of Rules 1.1 and 1.2 appears to have been well understood. *See Callaghan*, 238 W. Va. at 505, 796 S.E.2d at 614 (charging lawyer/judicial candidate with false statements violative of Rules 4.1 and 4.2, along with Rule 8.2 of the Rules of Professional Conduct, but no Rule 1.1 or 1.2 violations).

19

purposes of any alleged Rule 2.16(A) violation. *See supra* n.13. However, as discussed previously, Rule 4.1(A)(9)'s prohibition on "false or misleading" statements is applicable to judicial candidates; therefore, we find it appropriate to further examine these allegations to determine if respondent committed an additional violation of that rule.

JDC's brief claims that respondent "lied to the JIC about when she reached the rental agreement with Trabert and about her search for a place to live in Kanawha County." At another point in its brief, JDC claims respondent lied "about having attempted to consistently find lodging in Kanawha County in violation of Rule 2.16(A)." However, the only discussion of "consistently" searching for lodging in the Statement of Charges is an excerpt of a text respondent sent to *Ms. Trabert*, which is obviously not a statement made to the JIC or JDC. As to when she reached the rental agreement with Ms. Trabert, the Statement of Charges reiterates respondent's response to the complaint stating that the agreement was reached "last year," or 2023. As previously discussed, text messages produced by respondent reveal that she did in fact reach an agreement with Ms. Trabert in 2023 to rent from her and that she had made at least one other inquiry seeking a rental around the same time. Respondent's testimony during her sworn statement was consistent with these representations.

We have established that we are not constrained by respondent's factual admissions to the allegations in the Statement of Charges, yet even those admissions do not support a conclusion that she lied about either issue. Instead, the Statement of Charges

20

merely quotes a text to Ms. Trabert stating respondent had been "actively looking for an apartment for several months to move back down there" and that she had "emails to apartment places[.]" The charges then allege that she did not produce any such emails. Admission to having sent these texts or not producing emails in support is not an admission to lying about the content of the texts and we find nothing in the record demonstrating that either representation was false. Therefore, we find no additional violation of Rule 4.1(A)(9).

In sum, following our de novo review, we find that respondent did not violate Rule 1.1, Rule 1.2, Rule 2.16(A), Rule 4.2(A)(1), or Rule 4.2(A)(2) of the Code of Judicial Conduct, as alleged in the Statement of Charges. The record, however, does support respondent's violation of Rule 4.1(A)(9), based upon her residency representations, as discussed above.

### D. Sanctions

Having found one violation of the West Virginia Code of Judicial Conduct, we turn now to the appropriate sanction.

> Under Rule 4.12 of the *Rules of Judicial Disciplinary Procedure* [1998] the Judicial Hearing Board may recommend, or this Court may impose, one or more of the following sanctions for each violation by a justice, judge, or magistrate of the *Code of Judicial Conduct*: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement in limited circumstances. Additionally, this Court can assess the cost of the disciplinary proceedings against a justice, judge, or magistrate.

21

Syl. Pt. 6, *In re Watkins*, 233 W. Va. 170, 757 S.E.2d 594 (2013). The sanction agreed to by the parties and recommended by the Board for respondent's underlying misconduct is suspension without pay for two months, censure, and payment of costs.

> In considering suspension of a judicial officer, the Court should evaluate
>
> (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007). Although respondent's misconduct does not involve criminality, violence, or a "callous disregard" for our justice system, her misconduct was undertaken to secure appointment to a position of public trust in the judiciary, making the first two *Cruickshanks* factors our predominant considerations.

There can be little doubt that the public's perception of the administration of justice is affected by respondent's misconduct. The Court's obligation to enhance public confidence in the judiciary "must, at a minimum, begin by regulating the conduct of those who seek to become members of the judiciary[.]" *Callaghan*, 238 W. Va. at 507, 796 S.E.2d at 616. Whether elected or appointed, dishonesty by judicial officials or those who seek to hold judicial office is particularly troubling because this type of misconduct "strikes

22

at the very heart" of judicial officials' authority and their expectation that those who appear before them "will be truthful and candid in adherence to their oath and in deference to [their] authority over the proceedings." *In re Rock*, 249 W. Va. 631, 643, 900 S.E.2d 57, 69 (2024). Because "the public has a rightful expectation of scrupulous honesty from its judiciary[,]" it is understandably wary of judicial officials who engage in misconduct in their efforts to obtain a position of authority over them. *Id.* at 644, 900 S.E.2d at 70; *see also Callaghan*, 348 W. Va. at 521, 796 S.E.2d at 630 (discussing seriousness of judicial candidate's use of falsehoods in an "effort[] to achieve professional gain[.]").

And although respondent's misconduct did not occur while she held judicial office, we cannot ignore the implications of her misconduct on the public office she now holds and the resulting effect on her public persona under the second *Cruickshank* factor. We have acknowledged that

> "[i]t matters not that the complained of conduct occurred before assumption of judicial office or was otherwise unrelated to the performance of judicial duties. When a person known to have engaged in unprofessional conduct is allowed without reproach to exercise his judicial function, the integrity of the entire judiciary is put in question and its ability to perform impaired."

*Comm. on Legal Ethics of the W. Va. State Bar v. Karl*, 192 W. Va. 23, 34, 449 S.E.2d 277, 288 (1994) (quoting *In Re Ryman*, 232 N.W.2d 178, 184 (Mich. 1975) (Levin, J., dissenting, in part, and concurring, in part)). It is equally immaterial that respondent's misconduct did not result in her obtaining the vacancy appointment in Kanawha County. She now sits as an elected Nicholas County magistrate and the citizens she currently serves

deserve no less reassurance that their judicial officials will be held to account for their misconduct.

That said, we agree that respondent was cooperative in the underlying proceedings and has demonstrated genuine and appropriate remorse. We recognize respondent's many years of service to our magistrate court system and the apparent absence of any allegations of prior misconduct. While respondent does herself credit by acknowledging her wrongdoing, we are also mindful that "[a]ny sanction must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future." *Karl*, 192 W. Va. at 34, 449 S.E.2d at 288 (quoting *In re Benoit*, 487 A.2d 1158, 1174 (Me. 1985)) (citation modified). While serving the goals of punishment and deterrence, our sanction must also be tempered by consistency and fairness.

To that end, we find the two judicial misconduct cases most instructive are *Callaghan* and *Rock*. In *Callaghan*, we reprimanded and suspended a lawyer/judicial candidate without pay for two years for violations of Rules 4.1 and 4.2, as well as a concurrent violation of the West Virginia Rules of Professional Conduct, resulting from a false campaign flyer. 238 W. Va. at 528, 796 S.E.2d at 637. In *Rock*, we reprimanded a family court judge for two violations of Rule 2.16(A), as well as concurrent Rule 1.1 and 1.2 violations, for serially misrepresenting her involvement with a critical letter written by

24

a fellow family court judge. 249 W. Va. at 646, 900 S.E.2d at 72. The instant case falls somewhere in the expanse between the reprimand in *Rock* and the two-year suspension *Callaghan*, their disparity being attributable to the seriousness of the underlying facts. Judge Rock falsely attempted to distance herself from the fallout of an incendiary letter by denying under oath to JDC having "'seen or heard'" of it despite having proofread and offered edits to it. *Id*. at 640, 900 S.E.2d at 66. Judge Callaghan, on the other hand, distributed a false campaign flyer shortly before a judicial election in which he narrowly defeated his opponent and offered "extremely limited remorse." *Callaghan*, 238 W. Va. at 522, 796 S.E.2d at 631. We find that while the scale of the misrepresentation in this case more closely approximates that in *Rock*, the attempted professional gain and potential impact on the integrity of the judicial appointment process is more akin to the motive and elective process disrupted in *Callaghan*.

In consideration of these factors, we find that respondent's admitted misrepresentation to garner a vacancy appointment is serious misconduct warranting suspension and formal condemnation.[15] And despite our reduction of the number of established Rule violations, the essence of respondent's underlying misconduct remains. Accordingly, we adopt the Board's recommended sanction and order that respondent be

---

[15] "A censure constitutes formal condemnation of a judge who has engaged in conduct which violated the Code of Judicial Conduct." W. Va. R. Jud. Disciplinary Proc. 4.12.

25

suspended without pay for two months, censured, and required to pay costs in the amount of $618.45.

## IV.

## CONCLUSION

The Court imposes the following discipline:

1.	respondent is suspended for two (2) months without pay for her violation of Rule 4.1(A)(9) of the West Virginia Code of Judicial Conduct;

2.	respondent is hereby censured for this violation; and

3.	respondent is ordered to pay costs in the amount of $618.45.

The Clerk of this Court is ordered to issue the mandate forthwith.

Suspended and other sanctions ordered.